Fletcher CASEY, et al., Plaintiffs,

v.

Samuel A. LEWIS, et al., Defendants.

Civ. Nos. 90–0054 PHX CAM,
91–1808 PHX CAM.

United States District Court,
D. Arizona.

April 30, 1993.

Alice Loeb Bendheim, Phoenix, AZ, Adjoa A. Aiyetoro, Stuart Henry Adams, Jr., David Cyrus Fathi, National Prison Project of America, Civ. Liberties Union Foundation, Washington, DC, for plaintiffs.

Kathleen L. Weinecke, Daniel Struck, Jones, Skelton & Hochuli, Phoenix, AZ, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

### DUE PROCESS

MUECKE, District Judge.

Having considered the evidence presented by the parties relevant to the due process issue, the Court concludes as follows:

#### Background

The plaintiffs allege that defendants deliberately punish inmates using administrative segregation rather than bringing disciplinary charges, in order to circumvent the due process protection they would have to provide the prisoner if he or she were charged with a disciplinary infraction. Specifically, plaintiffs argue that defendants rely on uncorroborated confidential information to move prisoners to administrative segregation facilities when they do not believe they could obtain a conviction on a disciplinary charge. Defendants respond that plaintiffs have not established that defendants punish inmates by raising their risk scores and transferring them to higher custody segregated facilities rather than conducting disciplinary hearings. Defendants further argue that no liberty interest exists in Arizona to remain in the general prison population, thus procedural due process protection is not required for administrative segregation. Further, defendants argue that they provide any procedural due process protection that would be required if plaintiffs had a liberty interest.

#### Findings of Fact

**A. ADOC Classification System and Policy**

**1. Present Policy**

The Arizona Department of Corrections employs an objective classification system which was initiated in 1986 and had a major revision, relevant to confidential informants, effective January of 1991. The present policy consists of ten specific management factors upon which all inmates are rated. These ten factors represent the correctional classification profile of that inmate and pro-

vide a basis for recommendations as to which unit or facility the inmate will be placed within the institutional system.[1] The ten factors are divided into two categories representing public risk and institutional risk. The two categories are rated on a scale of 1 to 5, with 5 being the highest need or risk, and 1 representing the lowest need or risk.[2] These two numbers are referred to as the inmate's P/I score.

Every 180 days, at a minimum, the Institutional Classification Committee (ICC) schedules each inmate for review of his correctional classification profile or P/I score. There are ICCs at every facility throughout the Department of Corrections.[3] Inmates appear at their classification hearings and have the opportunity to comment in terms of whether they agree or disagree with the recommendations.[4] Prior to the hearing, an inmate receives a classification referral form that advises him of the approaching Reclassification Committee hearing. The classification referral form also advises the inmate that he will have a certain amount of time to prepare unless he wishes to waive that right and appear sooner for reclassification.[5] The inmate has the opportunity to provide a statement or witnesses' statements.[6] In some cases, an inmate may have a low or medium P/I score but be confined to a higher custody facility. For example, the inmate's risk score may be a 3, but he is confined by the ICC, with approval of the Central Classification Committee, in a 4 or 5 facility. This situation is referred to as a facility override.

Facility overrides can be utilized on the basis of specific circumstances of an individual case. The Department of Corrections maintains a maximum of 10% overrides for all offender actions in any given year.[7]

After the ICC makes its recommendation, the facility warden or administrator adds his or her recommendation.[8] The Central Classification Committee makes the final recommendation.[9] A Reclassification Committee is not permitted to implement its own recommendation without first obtaining approval from the Bureau of Offender Services.[10] The inmate may appeal the final determination made by Central Classification to the Administrator of the Bureau of Offender Services.[11] The Bureau of Offender Services has the authority to uphold or modify the classification or order a rehearing.[12] Robert Olding, Administrator of the Bureau of Offender Services with the Arizona Department of Corrections, is the final authority of record in determining whether the recommendation of the Reclassification Committee will be upheld or overturned.[13]

During the reclassification process, an inmate's classification may be increased based on the use of confidential information.[14] Current Departmental policy requires that the reliability of a confidential informant be established in an attempt to corroborate the confidential information before any action is taken against the inmates.[15]

1. Olding testimony, 1/14/1992, p. 116, lines 12–25; Defendants' Exhibit 806.

2. Olding testimony, 1/14/1992, p. 116, lines 15–21; Keeney testimony, 1/27/1992 at p. 44, lines 7–14; Defendants' Exhibit 806 and 809.

3. Keeney testimony, 1/27/1992, p. 44, line 22—p. 45, line 1; Olding testimony, 1/14/1992, p. 122, line 22—p. 123, line 10; Defendants' Exhibit 806.

4. Olding testimony, 1/14/1992, p. 123, lines 12–15; Defendants' Exhibit 806.

5. Olding testimony, 1/14/1992, p. 123, lines 16–24; Defendants' Exhibit 806.

6. Defendants' Exhibit 806, IMP 500.5.5.3.5.

7. Defendants' Exhibit 806.

8. Defendants' Exhibit 806.

9. Defendants' Exhibit 806.

10. Olding testimony, 1/14/1992, p. 134, lines 7–13.

11. Defendants' Exhibit 806, IMP 500.8.

12. Defendants' Exhibit 806, IMP 500.8.3.

13. Olding testimony, 1/14/1992, p. 133, line 24—p. 134, line 6; Stipulation, § III.

14. Olding testimony, 1/14/1992, p. 126, lines 14–17; Defendants' Exhibit 806.

15. Olding testimony, 1/14/1992, p. 126, lines 14–17; Defendants' Exhibit 806.

In order for information from a confidential informant to provide the basis for a recommendation that an inmate's classification be increased, several requirements must be met. First, there must be some corroboration to the confidential informant's information.[16] Additionally, the person writing the report (not the informant) must appear at the reclassification hearing and provide testimony to the Committee about information received from the confidential informant.[17] The Department utilizes a Confidential Informant Reliability Assessment Questionnaire to insure the reliability of confidential information.[18] The purpose of the form is to provide information regarding the investigation and the reliability and corroboration of the confidential information.[19] The history of the confidential informant is examined to determine whether (1) he/she has provided reliable or unreliable information in the past, (2) there is any identifiable gain on the part of an informant and (3) corroboration of the information exists through evidence or a staff report.[20] The Confidential Informant Reliability Assessment Questionnaire is typically completed by the reporting investigator or officer who has written a report regarding the existence of confidential information.[21] This is the same officer who is required to appear in person at the Reclassification Committee hearing.[22] If the questionnaire is not adequately completed or does not meet the requirements set forth in the operations manual, the Committee should disregard the information provided from the confidential informant pertaining to the inmate's classification.[23]

To ascertain the reliability of the information contained in the questionnaire, the reporting officer must look specifically at how the information came about, the history of the confidential informant in terms of providing information, and the information's reliability.[24] If the confidential informant had a history of providing reliable information, that history would be a factor for consideration in determining the reliability of the information.[25] If the informant had provided information discovered to be unreliable, this history would also be a factor for the Committee's consideration.[26] The identity of the confidential informant is not made known to the inmate whose classification is under assessment.[27] Defendants conceal the identity of the confidential informant to avoid endangering either the informant or the individual whose classification is under review and to minimize inter-inmate conflict.[28]

In approximately January 1991 and April 1991, the facilities were provided with the new policies on the use of confidential information in classification and disciplinary cases, respectively.[29] A classification seminar was held in the spring or early summer 1991 to train staff in use of the forms attached to the policies.[30] The policies require establishing the reliability of the informant

16. Olding testimony, 1/14/1992, p. 126, lines 18–25; Defendants' Exhibit 806.

17. Olding testimony, 1/14/1992, p. 126, lines 18–25; Defendants' Exhibit 806.

18. Olding testimony, 1/14/1992, p. 126, line 18—p. 127, line 6; Defendants' Exhibits 806 and 809.

19. Olding testimony, 1/14/1992, p. 128, lines 15–18; Defendants' Exhibit 806.

20. Olding testimony, 1/14/1992, p. 133, lines 2–17; Defendants' Exhibit 806.

21. Olding testimony, 1/14/1992, p. 128, lines 8–11; Defendants' Exhibit 806.

22. Olding testimony, 1/14/1992, p. 128, lines 12–14; Defendants' Exhibit 806.

23. Olding testimony, 1/14/1992, p. 128, line 24—p. 129, line 7; Defendants' Exhibit 806 and 809.

24. Olding testimony, 1/14/1992, p. 130, lines 10–20; Defendants' Exhibit 806.

25. Olding testimony, 1/14/1992, p. 130, line 21—p. 131, line 1; Defendants' Exhibit 806.

26. Olding testimony, 1/14/1992, p. 131, lines 4–10; Defendants' Exhibit 806.

27. Olding testimony, 1/14/1992, p. 134, lines 14–18.

28. Olding testimony, 1/14/1992, p. 134, lines 20–22.

29. Stipulation, § III; Defendants' Exhibits 806 and 808.

30. Stipulation, § III.

and attempting to corroborate the information prior to taking any actions.[31] Defendants agree that these policies will continue to remain in effect at all Arizona State Prison Complexes.[32] In some of the facilities, security staff indicated they never relied upon confidential information for classification or disciplinary decisions, but if they ever had occasion to do so they would follow the 1991 policies.[33] Other facilities indicated that they do not use confidential information in the absence of corroborating physical proof.[34] Some units using confidential information indicated that inmates are only locked down on confidential information where another inmate is at risk or where the security of the institution is threatened.[35] The Central Office staff monitors the use of confidential information on those cases that are appealed to them.[36] Only a small percentage of cases are appealed.[37] Specific differences from this policy are noted below: [38]

### 1. Florence Facilities:
#### a. SMU.

This unit uses a form called the Contemporaneous Record Form, which is similar to the department's form contained in the 1991 procedure. The Contemporaneous Record Form was introduced in July 1991.[39]

#### b. East Unit.

Prior to the 1991 policy, this unit used a narrative format for disciplinary reports that was supposed to contain information on the confidential informant. After the 1991 seminar, they began using the form for classification and disciplinary.[40]

#### c. North Unit.

A form is not used to determine the reliability of confidential information when used in disciplinary cases. ADOC staff was to have included similar information in their incident reports.[41] The reliability and credibility of information is based on the available physical evidence and what is said on the yard.[42]

There were six cases in the eight months prior to the tour relying on confidential information. Four of these cases were related to one assault.[43]

Unit staff will not take action solely on the basis of confidential information; corroborating physical evidence is required.[44] The Deputy Warden stated he would have no problem requiring his staff to complete the Department's confidential information forms.[45]

#### d. CB6.

The CB6 staff indicated they did not utilize confidential information.[46]

#### e. Women's Unit.

The Women's Unit staff indicated they did not utilize confidential information.[47]

### 2. Winslow: Kaibab Unit.

The staff at Kaibab Unit are provided training twice a year in use of confidential information. Security staff have used the reliability forms since January 1991 or December 1990. Security staff will not use confidential information in the absence of corroborating physical evidence.[48]

---

31. Stipulation, § III.

32. Stipulation, § III; Defendants' Exhibit 808.

33. Stipulation, § III.

34. Stipulation, § III.

35. Stipulation, § III.

36. Stipulation, § III.

37. Stipulation, § III.

38. Stipulation, § III.

39. Stipulation, § III.A.1.

40. Stipulation, § III.A.2.

41. Stipulation, § III.A.3.a.

42. Stipulation, § III.A.3.b.

43. Stipulation, § III.A.3.c.

44. Stipulation, § III.A.3.d.

45. Stipulation, § III.A.3.e.

46. Stipulation, § III.A.4.

47. Stipulation, § III.A.5.

48. Stipulation, § III.B.1–3.

3. Perryville.

This facility started using the department form in April 1991. Prisoners are placed in lockdown immediately based on confidential information pending verification of the confidential information if the situation is life threatening or a major breach of security.[49] The form is filled out if the prisoner is facing a disciplinary or classification procedure in which confidential information will be used, even when physical evidence is found.[50] The credibility check on confidential information may take 30 days, but this is rare. When a prisoner is locked down because the incident is life threatening or caused a major security breach, the credibility check takes approximately 11 days.[51]

**2. Policy Prior to January of 1991**

Prior to the 1991 revision in policy for confidential informants, ADOC did not utilize the confidential information reliability form in order to determine objectively the reliability of confidential information.[52] Prisoners were not informed of the specific details of the alleged activity that would identify the confidential informant.[53] The inmate is provided with enough information to understand what the allegation consists of and enough information for them to understand the logic of why classification action was taken and on what that action was based.[54]

**B. Inmate Testimony**

To support their claims, plaintiffs presented the testimony of two inmates. The first inmate was Jeffrey Phillips. In August of 1990, inmate Jeffrey Phillips was confined in the Kaibab Unit in Winslow, Arizona.[55] Inmate Phillips' classification score in August of 1990 was 4/1. The two numbers mean that inmate Phillips was classified on a scale of 1 to 5 as a public risk of 4 and an institutional risk of 1.[56] On September 4, 1990, the Chief of Security at the Kaibab North Unit obtained confidential information that Jeffrey Phillips and his cell mate (Axley) were plotting to escape through the barber shop from the Kaibab Unit. The confidential information was corroborated by the following physical evidence and information:[57] As a result of the information, security searched the barber shop within the multi-purpose building in the Kaibab Unit. The search resulted in the discovery of a pry bar. Security also determined that a vent above the barber shop had been opened and all the bolts were loose.[58] Phillips' cell mate Axley worked in the barber shop. In addition, Phillips frequented the barber shop every day, or very often when he was out on the yard.[59] Both inmates were serving long sentences and had previous escape histories.[60]

Inmate Phillips was placed in a lockdown unit in Winslow, Arizona on September 5, 1990.[61] He was not told on September 5, 1990 why he was placed in lockdown.[62] Two days later, on September 7, 1990, inmate Phillips was taken in front of the Institutional Classification Committee (ICC) and informed that he was under investigation for

49. Stipulation, § III.C.1.

50. Stipulation, § III.C.2.

51. Stipulation, § III.C.3.

52. Copeland testimony, 1/16/1992, p. 98, lines 6–7; p. 112, lines 8–11.

53. Olding testimony, 1/14/1992, p. 154, lines 1–7; p. 171, lines 12–18.

54. Olding testimony, 1/14/1992, p. 155, lines 12–18.

55. Phillips testimony, 12/16/1991, p. 176, lines 13–14.

56. Phillips testimony, 12/16/1991, p. 177, lines 4–7.

57. Ryan testimony, 1/15/1992, p. 165, lines 1–3.

58. Ryan testimony, 1/15/1992, p. 163, line 24—p. 164, line 14.

59. Ryan testimony, 1/15/1992, p. 175, lines 21–24.

60. Ryan testimony, 1/15/1992, p. 164, lines 20–25.

61. Phillips testimony, 12/16/1991, p. 177, lines 13–21.

62. Phillips testimony, 12/16/1991, p. 177, lines 22–24.

plotting to escape.[63] Inmate Phillips was present at the hearing and had the opportunity to make a statement.[64] The committee found: [65]

> Based on file review, i/m[inmate] interview, institutional record and attached incident reports, ICC recommends P & I scores increase from 4/1 to 4/5 and transfer to ASPC–F SMU. In addition to information from attached incident reports, i/m has history of escape (walk away from CRC in Indiana in 1985) and parole absconding from Indiana DOC in 1987. Has 11 years to earliest parole.

The Deputy Warden approved the override of the I score and placement in SMU [AO8].[66] Central Classification in Phoenix overruled the ICC, concluding that the documentation relied on did not support ICC's recommendation to override the I score and ordered that the prisoner's score remain unchanged at I/1.[67]

Subsequently, on October 12, 1990, George Herman, the Deputy Warden at Winslow, submitted a memo to Central Classification with the information relevant to the escape.[68] The memo provided, in pertinent part:

> On September 4, 1990, we received information from what is considered a reliable source, that the above two mentioned inmates were planning a (sic) escape from the Kaibab North yard.

> This information included the location of a pry bar and possible hack saw blades that were hidden, as well as, the escape route which was to be a drainage tunnel located between the Multi–Purpose building and CB1.

We were able to find the pry bar tool, however, we did not find any hack saw blades.

> We were also advised by the C.I. that an escape hatch through a vent located in the Barber shop, where inmates Axley worked, would be used in the escape. The vent in question was then inspected by Warden Ryan and Capt. J. French who discovered all the bolts were loose in the vent accessing the Multi–Purpose building from the Barbershop.

> Information was also given that the escape attempt would occur within the next couple of days.

Based on this information, the ICC conducted another hearing on October 25, 1990.[69] The inmate was present and allowed to make a statement.[70] ICC recommended: [71]

> Based on file review, inst. rec [institutional record], i/m [inmate] interview, and attached memo [above memo], ICC rec [recommends] P & I scores remain 4/1, and transfer to ASPC–F Central Unit, P–Score o/r [override].

The ICC had evidence that inmate Phillips had an escape history as he had escaped from a facility in Indiana in 1985 and that he was charged with absconding from an Indiana DOC facility in 1987.[72] In recommending the transfer and reclassification of Mr. Phillips, the ICC also had information that inmate Phillips and his cell mate (Axley) were planning to escape from the Kaibab north yard through a drainage tunnel located under a multipurpose building.[73] The confidential informant from whom this information was received had been reliable in the

---

**63.** Phillips testimony, 12/16/1991, p. 178, lines 5–10; p. 198, lines 12–15.

**64.** Plaintiffs' Exhibit 290.

**65.** Plaintiffs' Exhibit 290.

**66.** Phillips testimony, 12/16/1991, p. 165, line 1—p. 166, line 3; p. 179, lines 14–22; Plaintiffs' Exhibit 290.

**67.** Plaintiffs' Exhibit 290.

**68.** Defendants' Exhibit 541(a).

**69.** Plaintiffs' Exhibit 293.

**70.** Plaintiffs' Exhibit 293.

**71.** Plaintiffs' Exhibit 293; Phillips testimony, 12/16/1991, p. 180, lines 24–25, p. 181, lines 1–24.

**72.** Phillips testimony, 12/16/1991, p. 189, lines 3–6, 13–15; Plaintiffs' Exhibit 290.

**73.** Phillips testimony, 12/16/1991, p. 190, lines 20–23; Defendants' Exhibit 541(a).

past and the physical evidence confirmed the confidential informant's information.[74]

The warden approved the override based on length of sentence, escape threat and history of escape.[75] Central Classification then overruled the ICC's recommendation of a 4/1 score with an override and ordered that his final classification score be raised to 4/5 and that he be transferred to lockdown at SMU.[76] Mr. Phillips was reclassified as a 4/5 and transferred to SMU on January 7, 1991.[77]

The second inmate that presented testimony was Pete Celaya. In January of 1988, inmate Celaya received a disciplinary violation for kicking and fighting, which resulted in his transfer to lockdown status at SMU.[78] On March 14, 1989, the ICC conducted a reclassification score hearing.[79] The inmate was present and allowed to make a statement. The ICC decided that the P & I score should remain at 3/5 and that inmate Celaya should remain in SMU based on confidential information that he was involved in gang activity [a CIF report dated 3/6/89].[80] This action was affirmed by the warden and Central Classification on March 14 and March 17, respectively.[81]

On November 6, 1989, the ICC reviewed inmate Celaya's classification and recommended a reduction to a 3/3 score with placement in Perryville.[82] Central Classification approved the reduction.[83] Inmate Celaya was transferred from SMU lockdown, the highest custody facility, to the San Juan Unit at Perryville, a low-medium facility in January of 1990.[84]

Inmate Celaya was locked down at Perryville in March of 1990 based on information from confidential informants.[85] At that time, his classification score was 3/3.[86] Warden Dale Copeland of the Perryville facility was the Deputy Warden of the San Juan Unit at that time. He received numerous anonymous kites that Celaya was involved in organizing Mexican inmates to run drug activities within the San Juan Unit. He also received anonymous kites that Celaya was attempting to extort other inmates within the San Juan unit.[87] Warden Copeland intercepted a letter written in Spanish which indicated there was going to be a hit on another Chicano inmate in the unit. Approximately 48 hours after the letter was intercepted, a confidential informant came forward and told Warden Copeland that Celaya was ordering the hit on the other inmate.[88] The confidential informant had dealt with Warden Copeland on two previous occasions. On both occasions, the information that Warden Copeland had received from the informant was reliable.[89] The second informant, who was to be the victim of the hit, told Warden Copeland that he received information that Celaya had ordered a hit on him as well.[90] Further, War-

---

74. Ryan testimony, 1/15/1992, p. 178, line 23—p. 179, line 5.

75. Plaintiffs' Exhibit 293.

76. Plaintiffs' Exhibit 293; Phillips testimony, 12/16/1991, p. 181, line 25, p. 182, lines 1–25, p. 183, lines 1–14.

77. Phillips testimony, 12/16/1991, p. 187, lines 2–3.

78. Celaya testimony, 12/17/1991, p. 42, line 25, p. 43, lines 1–10; Plaintiffs' Exhibit 19b.

79. Plaintiffs' Exhibit 19b.

80. Celaya testimony, 12/17/1991, p. 43, lines 11–19, Plaintiffs' Exhibit 19b.

81. Plaintiffs' Exhibit 19a.

82. Plaintiffs' Exhibit 19a.

83. Plaintiffs' Exhibit 19a.

84. Copeland testimony, 1/16/1992, p. 95, lines 12–15; Celaya testimony, 12/17/1991, p. 46, lines 10–16.

85. Celaya testimony, 12/17/1991, p. 46, lines 17–23; Copeland testimony, 1/16/1992, p. 103, lines 5–23, p. 104, lines 19–22; Plaintiffs' Exhibit 19b.

86. Celaya testimony, 12/17/1991, p. 47, lines 1–2.

87. Copeland testimony, 1/16/1992, p. 95, line 22—p. 96, line 3.

88. Copeland testimony, 1/16/1992, p. 96, lines 7–23.

89. Copeland testimony, 1/16/1992, p. 97, lines 3–8.

90. Copeland testimony, 1/16/1992, p. 99, lines 10–14.

den Copeland believed that Celaya was involved in organizing Mexican inmates on the yard at Perryville because there were several incidents where officers had reported groupings of inmates with Mr. Celaya present. This was an occurrence that had not taken place prior to Celaya's arrival at the unit.[91] A number of the individuals in these groupings included white inmates that were reported to be involved in drug activities.[92]

On March 13, 1990, the ICC conducted a reclassification hearing.[93] Inmate Celaya was present and allowed to make a statement.[94] The ICC recommended that the P & I score remain 3/3 with placement in South Unit in Florence: [95]

> Based on file review and confidential information i/m [inmate] involved with New Mexican Mafia. It is also felt that Celaya is attempting to organize younger mexican inmates. It is also felt that i/m [inmate] is attempting to control drug traffic in the unit. Also i/m's [inmate's] brother is on the yard.

Warden Copeland disagreed recommending an increased P/I score of 4/3.[96] Central Classification agreed with the Warden and raised inmate Celaya's score to 4/3 and recommended placement in the Central Unit at Florence.[97] Inmate Celaya was informed that his classification score was raised to 4/3 and that he was to be transferred to a maximum security facility.[98]

A July 17, 1991 memo recommended that inmate Celaya be transferred from Central Unit in Florence to SMU [99] based on information from a confidential informant that

inmate Celaya was involved in a deadly assault in the Central Unit.[100] The ICC conducted a hearing on August 23, 1991, but continued the hearing for further information.[101] ICC resumed the hearing on August 27, 1991 recommended a P & I score of 4/1 with an override and placement in SMU.[102] The warden approved.[103] However, Central Classification ordered a rehearing because the required documents relied on by the ICC were not submitted.[104]

### Conclusions of Law

The first issue relevant to this issue are whether inmates within the Arizona Department of Corrections have a due process right in remaining in general population. Specifically, the issue is whether the inmates have a protected liberty interest in not having their public/institutional scores increased and remaining in general population, rather than being housed in higher custody facilities that segregate inmates.

### A. Do Plaintiffs have a protected liberty interest?

■ The Fourteenth Amendment to the U.S. Constitution states that no state shall "deprive any person of life, liberty, or property without due process of law. . . ." U.S. Const. amend. XIV, sec. 1. Therefore, the first step in a due process analysis is the determination of whether plaintiffs have a protected liberty interest in being included in the general prison population. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1089 (9th Cir.1986). Without a liberty interest, the

---

91. Copeland testimony, 1/16/1992, p. 113, lines 18–24.

92. Copeland testimony, 1/16/1992, p. 114, lines 4–7.

93. Plaintiffs' Exhibit 299; Copeland testimony, 1/16/1992, p. 104, lines 20–22.

94. Plaintiffs' Exhibit 19b.

95. Plaintiffs' Exhibit 19a.

96. Plaintiffs' Exhibit 19a.

97. Copeland testimony, 1/16/1992, p. 101, lines 17–23; p. 105, lines 18–23; Plaintiffs' Exhibit 19a.

98. Celaya testimony, 12/17/1991, p. 49, lines 1–4; Plaintiffs' Exhibit 19b.

99. Celaya testimony, 12/17/1991, p. 31, line 22— p. 32, line 8.

100. Celaya testimony, 12/17/1992, p. 32, lines 12–24; Plaintiffs' Exhibit 297.

101. Plaintiffs' Exhibit 297.

102. Plaintiffs' Exhibit 297.

103. Plaintiffs' Exhibit 297.

104. Plaintiffs' Exhibit 297.

constitution does not require prison officials to grant inmates any procedural protection before placing those inmates in administrative segregation. *Toussaint,* 801 F.2d at 1089 (citing *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)).

■ Liberty interests protected by the Fourteenth Amendment may arise from two sources: (1) the due process clause or (2) the laws of the states. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983).

## 1. Due Process Clause

■ The Supreme Court has held that the due process clause itself does not create a liberty interest in remaining within the general prison population or being free from administrative segregation.[105] *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869; *Toussaint,* 801 F.2d at 1091 (citing *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869). A liberty interest is not created even when administrative segregation involves "severe hardships", i.e. denial of access to educational, recreational, vocational, and rehabilitative programs, confinement to cells for long periods, or restrictions in exercise privileges. *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869.

■ The Supreme Court has also held that there is no liberty interest implicated in a prison's reclassification and transfer decisions. *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538. Given a valid criminal conviction, a criminal defendant has been constitutionally deprived of his liberty to the extent that the state may confine him and subject him to the rules of its prison systems so long as the conditions of confinement do not otherwise violate the Constitution. *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538. The Constitution does not require that the state have more than one prison for convicted felons, nor does it guarantee that the convicted prisoner will be placed in any particular prison. *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538. The conviction has sufficiently extinguished the defendant's liberty interest to empower the state to confine him in any of

its prisons. *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538. That life in one prison is much more disagreeable than in another does not in itself signify that a fourteenth amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules. *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538. Thus, the transferring of inmates to a more restrictive facility does not implicate a fourteenth amendment created liberty interest. *Meachum,* 427 U.S. at 224–25, 96 S.Ct. at 2538. Rather, it is reasonable for inmates to expect to be administratively segregated at some point in their incarceration, as a transfer to more restrictive facilities for nonpunitive reasons is contemplated by the terms of their confinement. *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869.

## 2. State created liberty interest

■ Statutes and regulations governing daily operations of a prison system do not confer any liberty interest in and of themselves. *Hewitt,* 459 U.S. at 469–471, 103 S.Ct. at 870–71. Rather, a liberty interest is created by "repeated use of explicitly mandatory language in connection with requiring specific substantive predicates." *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871. Thus, the use of language with "unmistakably mandatory character, requiring that certain procedures 'shall,' 'will' or 'must' be employed and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for control,' or 'the threat of a serious disturbance'" will create a liberty interest. *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871. Where state law gives prison officials the discretion to transfer prisoners for any number of reasons, not limited to instances of serious misconduct, no liberty interest is created. *Meachum,* 427 U.S. at 227–28, 96 S.Ct. at 2540.

■ In 1986, based on the regulations and statute effective at that time, the Ninth Circuit held that the Arizona statutes and regulations promulgated by the Legislature

---

**105.** Relevant to disciplinary proceedings, that are not involved in this case, the due process clause itself does not guarantee good-time credit for satisfactory behavior while in prison. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

and state correctional officials regarding administrative segregation did not create a liberty interest. *McFarland v. Cassady,* 779 F.2d 1426 (9th Cir.1986). The statute, A.R.S. § 41–1604(B)(2)(e), has not changed and grants discretion to the director of the Department of Corrections to transfer inmates.[106] In 1986, defendants' administrative regulations vested the Director with the power to reclassify a prisoner without regard to the suggested criteria or procedures when he determined "in his sole discretion, that adherence to the procedures ... may jeopardize the welfare or security of inmates, Department of Correction staff or the public." A.C.R.R. R5–1–206 (1986). This regulation no longer exists.[107] Rather, A.C.R.R. R5–1–206 provides:

> **R5–1–206 Security Measures within Prisons**
>
> **A.** All security procedures necessary to enable the Director to hold inmates in custody, as required by A.R.S. § 41–201.01 to ensure the safe, secure and orderly operation of the prison shall remain in effect and enforced without exception.

A.C.R.R. § R5–1–206 (1992). Because A.R.S. § 41–1604 and administrative regulation R5–1–206 place discretion for transfer of inmates with the Director, they do not create a liberty interest for inmates to remain in general population.[108]

■ The only remaining issue is whether the current classification and segregation policies create a liberty interest for inmates to remain in general population or in lower custody facilities or not have their classification risk scores increased. The policy for inmate classification is set forth in Defendants' Exhibit 806, which is Internal Management Policy (IMP) 500.1. This policy was effective January 1, 1991. A thorough review of the policy establishes that it does not create a liberty interest for inmates in a particular classification, in having a classification score decreased or in not having a classification score increased. The policy contains no mandatory language to the effect that a P/I score will not be increased unless certain conditions occur. Such language, referred to by the Supreme Court in *Hewitt* as "substantive predicates," does not exist in the policy. Unlike the regulations at issue in *Hewitt,* the policy does not require that risk scores will not increase or that inmates will not be moved absent such "substantive predicates" as "the need for control," or "the threat of a serious disturbance." Rather, the institution administrators have wide discretion to change those scores at any time during incarceration for any reason. The policy specifically provides that "a classification hearing may be scheduled at other intervals [in addition to the six month intervals] by the Institutional Warden, deputy Warden or Administrator when a change in Public Risk and/or Institutional Risk Scores may be indicated."[109] Thus, the classification policy does not create a liberty interest in changes in classification scores. *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871.

■ A review of the administrative segregation policy results in the same conclusion. The policy for administrative segregation is set forth at Defendants' Exhibit 807, IMP 304, effective November 3, 1989 and Defendants' Exhibit 808, IMP 600.5, effective January 3, 1989. The protective segregation policy provides that the Institutional Classification Committee also serves as the Protective Segregation Committee in each unit.[110] This policy is a similar, more simplified version of the reclassification policy. It does not

---

**106.** A.R.S. § 41–1604(B)(2)(e) provides:

> **B.** The director **may:**
>
> \* \* \* \* \* \*
>
> 2. Take any administrative action to improve the efficiency of the department, including but not limited to the following:
>
> \* \* \* \* \* \*
>
> (e) Transfer adult inmates between adult institutions or adult facilities.

A.R.S. § 41–1604(B)(2)(e) (1992) (emphasis added).

**107.** The history of the regulations indicates that many of the regulations were repealed upon a determination that such regulations were exempt from the Administrative Procedures Act.

**108.** *See also Lawrence v. ADOC,* 151 Ariz. 599, 729 P.2d 953 (1986).

**109.** Defendants' Exhibit 806, IMP 500.5.1.2.

**110.** Defendants' Exhibit 807, IMP 304.4.2.

contain any mandatory language or require that inmates remain in general population "absent specified substantive predicates" such as "the need for control," or "the threat of a serious disturbance." Rather, the institution administrators have wide discretion to place inmates in administrative segregation at any time during incarceration if an inmate is in "danger." Thus, the policy does not create a liberty interest in remaining in general population or not being placed in administrative segregation. *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871. Without a liberty interest, the constitution does not require prison officials to grant inmates any procedural protection. *Toussaint*, 801 F.2d at 1089.

■■■ IMP 600.5 is the policy for administrative segregation of inmates in Perryville. The policy defines administrative segregation as "a form of separation of an inmate from the general population administered by the Administrative Segregation Committee when the continued presence of an inmate in the general population would pose a serious threat to life, property, self, staff, or other inmates or to the secure and orderly operation of the institution in accordance with IMP 304.9." [111] This policy also allows wide discretion to the warden or administrator of the institution with liberal use of the word "may." For example, the policy provides that the warden "may" place an inmate in

immediate administrative detention "when it is deemed necessary to protect the inmate or others, or to preserve the orderly and secure operation of the institution." [112] The Committee "may" also place or release an inmate into administrative detention.[113] Therefore, this policy does not create a liberty interest for inmates in remaining in general population. *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871.

### 3. What Process is Due?

Because inmates do not have a due process clause or state created liberty interest in remaining in general population, not being transferred to higher custody facilities or not having their P/I scores increased, the constitution does not require prison officials to grant inmates any procedural protection. *Toussaint*, 801 F.2d at 1089.

However, a review of the policies establish that even assuming the inmates had a liberty interest to be in general population and free from administrative segregation and to not having their classification scores increased, any process that would be due has been provided to the inmates by the defendants.

■■■ Due process requirements differ for segregation based on whether the purpose of the decision is an administrative decision or for disciplinary purposes.[114] The Su-

111. Defendants' Exhibit 808, IMP 600.4.2.

112. Defendants' Exhibit 808, IMP 600.5.1.

113. Defendants' Exhibit 808, IMP 600.5.2—5.3.

114. In *Wolff v. McDonnell*, the United States Supreme Court held that [based on the state created liberty interest] due process requires certain procedural safeguards before a prison inmate can be deprived of statutory good time credits. *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Where a disciplinary hearing may result in the loss of good time credits, an inmate must receive written notice of the alleged violation at least twenty-four (24) hours prior to the disciplinary hearing. *Wolff*, 418 U.S. at 563, 94 S.Ct. at 2978, 41 L.Ed.2d at 955. This notice informs the inmate of the charges and enables him to prepare his defense. *Wolff*, 418 U.S. at 564, 94 S.Ct. at 2978, 41 L.Ed.2d at 95. At the hearing, the inmate may call witnesses and present evidence in defense of the charges when permitting the

inmate to do so would not threaten institutional security or correctional goals. *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2979, 41 L.Ed.2d at 956. The hearing officer must provide a written statement of the evidence relied on and the reasons for the disciplinary action taken. *Wolff*, 418 U.S. at 563, 94 S.Ct. at 2978, 41 L.Ed.2d at 955.

The Supreme Court further defined the quantum of evidence necessary to satisfy due process in a prison disciplinary decision. *Superintendent, Massachusetts Correctional Inst. v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). "The requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." *Hill*, 472 U.S. at 455, 105 S.Ct. at 2774, 86 L.Ed.2d at 365. The Court reasoned that since revocation of good time credits was not comparable to a criminal conviction due process did not require courts to set aside disciplinary decisions that have some basis in fact. *Hill*, 472 U.S. at 456, 105 S.Ct. at 1774, 86 L.Ed.2d at 365. A court's review under this standard "does not require examination of the entire record, inde-

preme Court in *Hewitt* held that an informal, and non-adversarial review of the evidence is sufficient to place an inmate who represents a security threat in administrative segregation pending an investigation of the misconduct charges against him or the accuracy of information received from confidential informants. *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 874. The *Hewitt* Court further held that an inmate placed in administrative segregation must merely receive "... some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation ..." *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 874.

■ The defendants' policy clearly meets any of the due process requirements that could exist if the defendants' policy had created a liberty interest in particular classifications so inmates had the right to be housed in particular facilities or general population. Pursuant to defendants' policy, every six months,[115] the Institutional Classification Committee (ICC) conducts classification hearings for each inmate.[116] The inmate must be notified of the hearing[117] and has the opportunity to provide a statement or witnesses' statements.[118] The ICC decision is reviewed by the warden or administrator of the facility and by Central Classification before it is implemented. The inmate is provided written notice of the determination. The inmate may appeal the final determination made by Central Classification to the Administrator of the Bureau of Offender Services.[119] The Bureau of Offender Services

has the authority to uphold or modify the classification or order a rehearing.[120]

Further, the record establishes that both plaintiffs Phillips and Celaya were provided such due process protection.[121] Both received notice and were present at their reclassification hearings and were allowed to make a statement. After the hearing and Central Classification approval, they received written notice of the reclassification decision and were allowed to appeal.

Plaintiffs also raise the issue of the use of confidential informants in the administrative segregation and reclassification processes. The Ninth Circuit has only addressed the issue of the use of confidential information in the context of disciplinary proceedings in which a liberty interest and due process rights exist. In *Zimmerlee v. Keeney,* 831 F.2d 183 (9th Cir.1987), *cert. denied,* 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988), the Ninth Circuit clarified the circumstances under which a prison *disciplinary committee* may rely on the statement of a confidential informant:

> We hold that a prison disciplinary committee's determination derived from a statement of an unidentified inmate informant satisfies due process when (1) the record contains some factual information from which the committee can reasonably conclude that the information was reliable, and (2) the record contains a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name.

*Zimmerlee,* 831 F.2d at 186.

The Ninth Circuit further explained:

pendent assessment of the credibility of witnesses, or weighing of the evidence." *Hill,* 472 U.S. at 455, 105 S.Ct. at 2774, 86 L.Ed.2d at 365; *Zimmerlee v. Keeney,* 831 F.2d 183, 186 (9th Cir.1987), *cert. denied,* 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988).

The evidentiary standard is minimal because the prison atmosphere is considered special, because prison officials often must act swiftly in exigent circumstances, based on minimal information. *Hill,* 472 U.S. at 455, 105 S.Ct. at 2774. Therefore, the due process clause of the Constitution does not require courts to set aside prison administrative decisions that are based in fact.

**115.** Defendants' Exhibit 806, IMP 500.5.4.

**116.** Defendants' Exhibit 806, IMP 500.5.4.

**117.** Defendants' Exhibit 806, IMP 500.5.5.2.

**118.** Defendants' Exhibit 806, IMP 500.5.3.5.

**119.** Defendants' Exhibit 806, IMP 500.8.

**120.** Defendants' Exhibit 806, IMP 500.8.3.

**121.** The decisions to transfer inmates Celaya and Phillips were based on administrative decisions relevant to possible escape and gang related activities, both of which relate to institutional security and personal safety concerns of inmates and guards. See *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 874. Although the plaintiffs alleged that they were transferred as punishment, there was no evidence that the purposes of the transfers were other than safety and security of the facilities.

Reliability may be established by: (1) the oath of the investigating officer appearing before the committee as to the truth of his report that contains confidential information, (2) corroborating testimony, (3) a statement on the record by the chairman of the committee that he had firsthand knowledge of sources of information and considered them reliable based on the informant's past record, or (4) an *in camera* review of the documentation from which credibility was assessed. Proof that an informant previously supplied reliable information is sufficient.

*Zimmerlee*, 831 F.2d at 186–187 (footnote and citation omitted).

 Defendants' present policy regarding the use of confidential informants clearly complies with these requirements. Further, although the segregation of inmates Celaya and Phillips were administrative in nature, and not disciplinary, the *Zimmerlee* due process requirements were satisfied for both inmates Phillips and Celaya. The confidential informants utilized in the decision to transfer Celaya and Phillips to more restrictive facilities both had a documented history of past reliability. In addition, the information obtained from the confidential informants was corroborated by physical evidence. The information obtained from the confidential informant used in Phillips' segregation decision was corroborated by the discovery of the specific type of physical evidence in the location described by the informant. Specifically, a pry bar was found in the barber shop where inmate Phillips planned to escape and loosened bolts in a vent identified by the informant were discovered. The information obtained from the confidential informant used in Celaya's segregation decision was also corroborated by physical evidence. A letter describing the planned assassination of another inmate was intercepted and relied on in the administrative decision to transfer Celaya to a more restrictive facility. Further, the prison Warden observed Celaya mingling with a group of inmates suspected of organized drug trafficking within the prison. Another confidential informant used in the Celaya administrative segregation decision had first-hand knowledge regarding the planned assassina-tion, as he was the intended victim. Thus, the decision to place Celaya and Phillips in administrative segregation at higher security facilities with less restrictions were warranted and grounded in fact. Furthermore, the safety of the confidential informants would be jeopardized by disclosure of their identities. Due process does not require the disclosure of the identity of the informant to the inmate. *Wolff*, 418 U.S. 539, 568–69, 94 S.Ct. 2963, 2980–81, 41 L.Ed.2d 935 (1974). Thus, the inmates received any due process that would have been required had they had a liberty interest in remaining in general population or placement in particular facilities and defendants did not violate plaintiffs' due process rights.

### Conclusion

The plaintiffs do not possess a liberty interest to be free from transfers to more restrictive facilities under the Fourteenth Amendment to the U.S. Constitution or under a state created liberty interest. Therefore, they are not entitled to procedural due process protection in the placement in administrative segregation or particular facilities or in the assessment of classifications or P/I scores. Even if plaintiffs had established a protected liberty interest, defendants provide plaintiffs with sufficient due process to satisfy the Constitution for administrative segregation and classification procedures. The Court commends defendants for providing due process protection and encourages defendants to continue providing such due process protection. By providing hearings which would satisfy any due process that would be required if a liberty interest existed, the defendants' decisions carry greater authority and a sense of fair play than if the decisions were conducted in an arbitrary manner without any basis in fact and without an opportunity for a hearing.