Mark A. KOCH, Plaintiff,

v.

Samuel LEWIS, et al., Defendants.

No. Civ. 90–1872 PHX–JBM.

United States District Court,
D. Arizona.

April 24, 2000.

951

Mark A. Koch, Florence, AZ, for plaintiff.

Alicia Marie Lawler, Office of Attorney General, Liability Management Section, Phoenix, AZ, for defendants.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Mark Koch is a convicted felon serving 25 years to life in the Arizona Department of Corrections (ADOC). He filed this action on December 7, 1990, pursuant to 42 U.S.C. § 1983, seeking damages, injunctive and declaratory relief for alleged violations of his civil rights. His amended complaint, filed March 22, 1991, alleges that prison officials[1] forced him,

---

1. Named defendants, sued individually and in their official capacity, include Samuel Lewis, director of ADOC; Roger Crist, complex warden for the Florence facility; Ernie Salazar, deputy warden for Cellblock Six; Fred Ballard, major of security for East Unit; Chuck Goldsmith, captain of security for East Unit; Lieutenant Martin, lieutenant of security for East Unit; CMO Lamb, East Unit chief movement officer, chairperson of East Unit disciplinary committee; Sgt. Najab, East Unit coordinator of discipline; and Sgt. Gay, East Unit coordinator of discipline.

without cause or notice, to submit to two urinalysis tests; mishandled his urine samples and exposed them to contamination; increased his risk classification score[2] based on a positive, but unconfirmed, result; and placed him in administrative detention and revoked some of his earned good time credits. Koch also claimed that defendants confiscated his personal stained glass craft materials without due process of law, denied him access to the law library and legal assistance, and subjected him to unreasonable strip- and body cavity searches. The gravamen of his complaint is that defendants took these actions in retaliation for his persistent pursuit of a number of legal actions against prison officials. If Koch's allegations are to be believed, a number of ADOC personnel understood Shakespeare's admonition to first kill all the lawyers.

After an initial decision granting partial summary judgment in favor of defendants, *Koch v. Lewis (Koch I )*, Civ. 90–1872–PHX–CAM (D.Ariz.1991) (Muecke, J.) (*amended* April 29, 1993), the district court granted summary judgment in favor of the defendants on all remaining issues and dismissed the action. *Koch v. Lewis (Koch II )*, Civ. 90–1872–PHX–CAM (D.Ariz. November 9, 1993) (Muecke, J.).

On August 1, 1995, the Ninth Circuit affirmed in part and reversed in part, finding that genuine issues of material fact precluded summary judgment on three of Koch's claims. *See Koch v. Lewis (Koch III )*, 62 F.3d 1424, 1995 WL 453247 (1995) (table). On the retaliation claim, the court found that summary judgment was inappropriate because the chronology of events "was more than adequate to raise an inference that the urine tests were ordered for the purposes of retaliation." *Id.*, at *11. Koch presented evidence that he had won a prior § 1983 action against the prison officials in October 1989,[3] that the jury in a second action returned a verdict in his favor in March 1990,[4] and that on September 11, 1990, he had filed a third action in state court against defendant Lewis for, *inter alia*, trover and conversion of his personal stained glass hobby craft materials. The first urine sample was taken on September 26, 1990.

Defendants had argued that because Koch's administrative segregation was the result of a positive drug test, the action promoted the prison's legitimate goal of imposing discipline for rule violations. Therefore, defendants argued, Koch could not show that the action "did not advance legitimate penological goals," a necessary element of a retaliation claim. *See Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir.1994). But the court rejected the argument, clarifying that Koch's claim was based on the theory that the urine tests were *ordered* as retaliation. "The prison officials cannot contend subjecting Koch to urine tests without cause … advanced any legitimate penological interests." *Koch III*, at *11. The court concluded

2. ADOC's general inmate classification policy is described in *Casey v. Lewis*, 837 F.Supp. 1009, 1011–15 (D.Ariz.1993) (Muecke, J.).

3. In an unrelated case by the same name, *Koch v. Lewis*, Civ. 88–267, 88–271 TUC RMB, Judge Bilby granted summary judgment for the plaintiff on his claims of denial of access to the courts, unreasonable searches, and invasion of privacy. Decisions were issued August 4, 1989 and October 25, 1989.

4. In *Vaughn v. Ricketts*, Koch and several other inmates filed a § 1983 action alleging that body cavity searches undertaken in 1984 violated their rights under the Fourth, Eighth, and Fourteenth Amendments. The case went up to the Ninth Circuit four times. In *Vaughn III*, an unpublished decision, the court of appeals remanded the case to the trial court for consideration on the merits. At trial, the jury found for Koch on his claim that the search and post-search conduct violated his Eighth Amendment rights, but also found that the prison officials were protected by qualified immunity. In *Koch v. Ricketts (Vaughn IV )*, 82 F.3d 317 (9th Cir.1996), the Ninth Circuit found the two verdicts inconsistent and remanded the case again to the trial court for further proceedings. The decision was handed down on January 12, 1996. In his summary judgment pleadings here, Koch states that he accepted a financial settlement in early January 1998.

that triable issues of fact existed as to whether either urinalysis was conducted as a result of information provided by a confidential informant or for some other, possibly illegitimate purpose.

The court also reversed the grant of summary judgment on the procurement and chain of custody issues. The court found triable issues of fact as to whether the procurement and handling of Koch's urine samples were in accordance with ADOC collection procedures, and, if not, whether the test results may constitute "some evidence" of Koch's guilt. *See Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Finally, the court reversed summary judgment on the alleged violations of ADOC's notice policy: "Defendants do not dispute that ADOC rules regarding the type of notice required when a prisoner is suspected of using drugs are written in mandatory language and, therefore, create a liberty interest under the Fourteenth Amendment." *Koch III,* 1995 WL 453247, at *6, *citing Hewitt v. Helms,* 459 U.S. 460, 471–472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). ADOC policy required that an inmate be given notice within twenty-four hours of the incident creating suspicion. The circuit court noted, however, that only a day before Koch's case was submitted to the Ninth Circuit, the Supreme Court issued its decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which abandoned *Hewitt*'s reasoning but did not overrule the decision. Because the parties had not briefed the issue,

the court directed the district court to resolve the issue on remand.

After briefing by the parties, Judge Silver dismissed Koch's claim that he was denied due process when the urine samples were collected without adequate notice. *Koch v. Lewis* (*Koch IV*), Civ. 90–1872–PHX–ROS (D.Ariz. Aug. 5, 1996) (Silver, J.). The judge found that under *Sandin,* the temporary denial of privileges did not implicate a state-created liberty interest because it did not impose an "atypical and significant hardship" on Koch "in relation to the ordinary incidents of prison life." Slip at 3, *quoting Sandin,* 115 S.Ct. at 2301 (1995). Nor did the forfeiture of Koch's earned release credits exceed "the expected parameters of the sentence imposed by law." *Id.* at 4. In the alternative, Judge Silver found that procedural due process requirements were satisfied. Unlike ADOC rules, there was no constitutional mandate that he be given notice within 24 hours of becoming a suspect, and Koch had not alleged that he was denied sufficient notice before his disciplinary hearing.

Judge Silver's order in *Koch IV* also granted plaintiff's motion for leave to file a supplemental complaint,[5] noting that the proposed pleading "contains allegations of a continuing pattern of mistreatment, including repeated and unwarranted transfers and disciplinary actions calculated to punish Koch for filing court actions." *Id.* at 6. Koch alleged that subsequent to the original complaint prison officials trans-

---

**5.** It is worth clarifying the record with respect to the filing of Koch's supplemental complaint. On February 7, 1996, Koch asked Judge Silver for leave to file a supplemental complaint, a copy of which was "lodged" in the record "on left of file" as doc # 88. As noted above, Judge Silver granted this request in her order of August 5, 1996. The "supplemental complaint," however, was never officially entered as part of the record. On August 15, 1996, Koch requested leave to file a *second* supplemental complaint, a copy of which was "lodged in the record" as doc # 100. On December 19, 1996, the docket indicates that a "supplemental complaint" filed August 15, 1996, was "lodged" in the

record with supporting exhibits, but it was given no number. On March 26, 1997, Judge Silver denied Koch leave to file the second supplemental complaint. More than a year later Magistrate Judge Mathis noted that the first supplemental complaint had never been officially entered in the record. In an order entered June 5, 1998, she directed the clerk to remove the supplement complaint from the left side of the file, to file it, and to give it a document number. The document was numbered # 124 and moved to the right side, but the entry to that effect appears on the official docket on May 27, 1998, thus pre-dating the Mathis order.

ferred him sixteen times among eight separate ADOC institutions; targeted him for additional urine tests without proper cause; denied him access to a law library and legal assistance, causing him to default in a pending lawsuit, CIV 93–0733–PHX–CAM; threatened him with classification as a gang member and extended "administrative" segregation in retaliation for his continued pursuit of the civil rights and property actions against jailhouse officials; and deprived him of his right to religious expression under the First Amendment and the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb–1 *et seq.* The new complaint also added two new defendants, Winslow Prison Complex Warden George Herman and Winslow–Kaibab Unit Deputy Warden Denny Harkins, both of whom allegedly participated in these events.

Finally, Judge Silver denied Koch's request for a preliminary injunction. She found that Koch had stated a *prima facie* case of retaliation with respect to the unwarranted transfers, and that defendants' failure to offer any explanation of the transfers suggested a likelihood of success on the merits. She declined to issue an injunction, however, because Koch had failed to demonstrate an immediate threatened injury—a prerequisite to obtaining preliminary injunctive relief. Judge Silver also rejected Koch's request to enjoin the implementation of DMO # 57 or its successor,[6] finding that any infringement on prisoner rights was not disproportionate to the policy's furtherance of important penological interests. *See Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). On appeal, the Ninth Circuit affirmed the court's denial of the preliminary injunction, but declined to review her dismissal of the notice claim. *Koch v. Crist* (*Koch V*), 127 F.3d 1105, 1997 WL 664939 (9th Cir.1997) (table).

We received the case on March 19, 1998. After much wrangling over discovery and repeated substitution of defendants' counsel, the parties filed cross motions for summary judgment on the supplemental complaint in the spring of 1999, in accordance with our invitation. We granted defendants' motion (docs # 154, 155) to file documents under seal, for the time being, and denied Koch's motion to strike (doc # 156). Defendants filed their motion for summary judgment (doc # 160) on April 23, 1999, and submitted a number of sealed and unsealed affidavits from corrections personnel.

Koch filed his response and cross motion for summary judgment (doc # 166) on May 25, 1999, relying heavily on evidentiary material originally submitted with his motion for a preliminary injunction (doc # 90). According to Koch, "it is undisputed that Plaintiff has not engaged in misconduct and that 'but for' his lawful associations he would not suffer indefinite punitive sanctions" (plf. mem. in support of his cross motion for summary judgment (plf.mem.) at 1). He makes the following arguments: first, that his validation as a member of a security threat group (STG) was initiated in retaliation for his legal work, violated due process standards requiring "some evidence" of gang affiliation for punitive sanctions, and violated the *Ex Post Facto* Clause because the policy penalized prior lawful associations; second, that his repeated transfer between correctional facilities was a continuation of the pattern of harassment and retaliation alleged in his original complaint; third, that he was denied access to the legal facilities, and consequently was forced to default a pending action against prison officials; and, finally, that ADOC's STG policies are unconstitutional as applied to him because they penalize associations required by his religion (contact) and mandate conduct prohibited by his religion (renunciation).

Defendants maintain, on the other hand, that plaintiff was validated as a member of

---

6. DMO # 57, ADOC's first policy on security threat groups, took effect on August 22, 1995, and was superseded by DO # 806 on September 1, 1996. That policy was replaced by the current version of DO # 806 on September 2, 1997.

the Aryan Brotherhood STG under a lawful administrative segregation policy designed to promote prison security. They insist that while plaintiff does not have a protectable liberty interest in his security classification, prison officials complied in any event with all procedural safeguards and made a legitimate and unbiased decision regarding his status. They argue that plaintiff's lockdown is insufficient to support a claim for denial of access to the courts because Koch cannot show that he missed any legal deadlines. Finally, they argue that all defendants are entitled to qualified immunity because they did not violate any of Koch's clearly established constitutional rights.

### Standards[7]

Summary judgment is appropriate if the evidence, read in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Barnett v. Centoni*, 31 F.3d 813, 815 (9th Cir.1994). If a nonmoving party bears the burden of proof at trial, he must establish each element of his claim with "significant probative evidence tending to support the complaint." *Barnett*, 31 F.3d at 815 (citations omitted).

### Analysis

A. *Retaliation Claims and Substantive Due Process*

In footnote 1 of their brief, defendants suggest:

> Since the time of his Supplemental Complaint, Inmate Koch has actually been validated as a member of the Aryan Brotherhood. Therefore, Inmate Koch's claim that he has been "threatened" with validation is now moot. Defendants will assume that Inmate Koch's

current claim is that his validation was the result of retaliation.

In this small footnote defendants do their best to recast the most damaging claim against them, and, in so doing, ignore the Ninth Circuit's holding in *Koch III, supra.* To the extent that Koch's claim is that validation proceedings were *initiated* against him in retaliation for his legal activities, defendants cannot defend merely by arguing that ADOC's STG policy serves legitimate penological goals and that procedural due process requirements were satisfied.

Due process contains a substantive component that bars certain arbitrary, wrongful governmental actions regardless of the fairness of the procedures used to implement them. *Daniels v. Williams*, 474 U.S. 327, 337–38, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Where a defendant's actions are motivated by retaliation, even if taken under different circumstances for a legitimate reason, such action is unlawful. *See Cornell v. Woods*, 69 F.3d 1383, 1388–89 and n. 4 (8th Cir.1995) (confirming that retaliatory transfer and retaliatory discipline cases remain good law after *Sandin* ); *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir.1995); *Black v. Lane*, 22 F.3d 1395, 1402 (7th Cir.1994); *Hines v. Gomez*, 108 F.3d 265 (9th Cir.1997) ("some evidence" standard does not extend to immunize retaliatory accusations by prison officials). Retaliation against a prisoner for exercising his legal right to file grievances may interfere with the prisoner's right of meaningful access to the courts.[8] *Hines*, 108 F.3d at 269; *see also Valandingham v. Bojorquez*, 866 F.2d 1135, 1137–38 (9th Cir.1989); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989); *Barnett v. Centoni*, 31 F.3d 813 (9th

---

7. Plaintiff, proceeding *pro se*, has shown that he is well aware of the standards for and consequences of summary judgment. *See Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir.1988).

8. One recent study reported that jailhouse lawyers were the most frequently disciplined

segment of the prison population. *See* Mark Hamm, Therese Coupez, et al, *The Myth of Humane Imprisonment: A Critical Analysis of Severe Discipline in Maximum Security Prisons, 1945–1990* (Prison Discipline Study, 34–36 (1991)), on file in the Warren H. Smith Library, Geneva, NY.

Cir.1994). Moreover, administrative segregation cannot be used as a "pretext for indefinite confinement of an inmate." *Hewitt v. Helms,* 459 U.S. at 477 n. 9, 103 S.Ct. 864; *Madrid v. Gomez,* 889 F.Supp. 1146, 1277–78 (N.D.Cal.1995).

Judge Silver found that Koch has presented a *prima facie* case of retaliation. *See Koch IV,* at 10. To make out the *prima facie* case, the individual has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the defendants' conduct. *Soranno's,* 874 F.2d at 1314, *quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Additionally, a prisoner must typically show that the retaliatory action does not advance legitimate penological goals, or was not tailored narrowly enough to achieve such goals. *Rizzo v. Dawson,* 778 F.2d 527, 532 (9th Cir.1985). It goes without saying, particularly after *Koch III,* that arbitrary targeting of inmates for STG validation is not an action narrowly tailored to achieve valid penological goals. Quite the opposite; instituting STG proceedings without good cause would misdirect prison resources away from proceedings involving a legitimate compromise to prison security.

Koch argues that Warden Herman and Warden Harkins originally threatened Koch with validation in response to Koch's inmate letters and grievances and his pursuit of legal remedies. *See* doc # 90, ¶ 21. He insists that the original validation hearing was a sham, and that he was denied notice of the charges against him, an impartial hearing, and an official finding of fact. SOF ¶ 12,13. He swears that the only record of the event is a pre-determined guilty finding "typed prior to the mock hearing on Gang Unit stationery from the Perryville prison in Phoenix, by a committee member who drove it across the state to present it at the Star Chamber in Winslow, 180 miles away." *Id.;* SOF Ex. 3. Further, Koch argues that the evidence used against him at his various validation hearings belies any threat he posed to the safety of the prison community. With the exception of the disputed urinalysis tests, plaintiff has never been sanctioned for misconduct or rules violations in twenty years of incarceration. On the contrary, the record indicates that he has on numerous occasions been commended for his exemplary behavior, his assistance with prison programming, and his troubleshooting, often at the behest of prison officials. While we need not review the validation evidence in detail here (we discuss it further below) it is flimsy and outdated, at best. It rests on prior lawful associations, a 17–year old photo from a prison rodeo, and contacts resulting from plaintiff's legal assistance to other inmates. We agree with Judge Silver's initial assessment.

Once the prisoner has established a *prima facie* case of retaliation and demonstrated that the retaliatory action does not advance a legitimate penological goal, the burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct. *Soranno's,* 874 F.2d at 1314. Defendants have failed to provide any evidence that defendant's conduct prior to his validation posed any threat to security whatsoever. They do allege, based on an affiant's statement, that information linking Koch as a member or associate of the Aryan Brotherhood dates back to January 18, 1990. *See, e.g.,* defs.' reply at 8. However, an examination of the incident report from January 1990 shows that it concerned correspondence from Koch to an inmate McGrath in which Koch "g[a]ve McGrath a name and address relative to the ACLU to assist McGrath in fighting McGrath's reclass to SMU." We find little or nothing in the record to explain why proceedings against Koch would have been instituted or why prison officials would find it necessary to assign him to a maximum security facility. But, because questions of motive are generally inappropriate for resolution on summary judgment, *Soranno's,* 874 F.2d at 1315, we deny both

motions for summary judgment on the retaliation claims. We anticipate that the additional incidents alleged in the supplemental complaint and supporting materials will be tried along with the retaliation claims remanded by the Ninth Circuit.[9]

### B. *Denial of Access to the Court*

Plaintiff's verified supplemental complaint alleges that he was forced to default a civil lawsuit against prison officials, *see* Civ. 93–0733–PHX–CAM, when he was denied access to legal facilities—specifically, it appears, access to law books. Defendants argue that plaintiff has failed to produce evidence of missed deadlines and therefore cannot show actual injury, a requirement for a denial of access claim. *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). But Koch's verified complaint may serve as an opposing affidavit, *McElyea v. Babbitt,* 833 F.2d 196, 197–98 (9th Cir.1987), as may his affidavit filed with his motion for a preliminary injunction (doc # 90). In the February 1996 affidavit, Koch indicates that within the first five months of his Kaibab Unit transfer (on February 22, 1995), he had important filing deadlines on both his habeas appeal to the Ninth Circuit and on his civil matter, but was nonetheless denied access to the law library on repeated occasions. (Doc # 90, at 4). Plaintiff submitted an extensive record of grievances and affidavits from the period supporting this allegation. He states that because of the limited access he "was forced to choose" between pursuing his habeas appeal and the civil action against defendant Lewis and other ADOC employees.

While the docket in 93–CV–733 is not entirely clear, it reflects an order by Judge Zapata, entered on July 28, 1994, instruct-

ing plaintiff to show good cause for his failure to file a response to defendants' motion for summary judgment. Koch apparently filed his final response to the motion on August 26, 1994, and defendants' filed their reply on September 21, still five months before the transfer. The record also indicates, however, two motions filed in March 1995 and an amended verified complaint filed a week before Judge Muecke granted summary judgment for defendants and terminated the case. It does not appear that Koch technically defaulted, but there is enough in the docket to create a genuine issue of fact as to how and why his action was dismissed.

 Inmates are not entitled to full-time access to a law library and delays due to legitimate penological interests may be excused, *Casey,* 518 U.S. at 361–62, 116 S.Ct. 2174, but the Constitution requires prison authorities "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Resolution of Koch's claim here will turn on whether Koch was given "adequate" access, whether any denial of access was justified, and whether any denial of access caused an actual injury. As material facts relevant to these issues remain in dispute,[10] summary judgment is denied.

### C. *Consideration of Pre–STG Policy Conduct Violated the Ex Post Facto Clause*

Koch argues that ADOC's security threat group validation policy is unconstitutional to the extent that it retrospective-

---

9. As we noted in our order of 3/27/2000, at 4, we may need to revisit the disclosure of documents pertaining to the instigation of validation proceedings against Koch on 3/7/95 and 1/9/96. See discovery requests (3) and (5). This documentation will be highly relevant to the retaliation claims. As for confidentiality concerns. Koch is aware of the evidence which was ultimately included in his validation packet and the state has now con-

ceded that confidential informants were not relied upon to validate Koch as a member of the Aryan Brotherhood.

10. In our order dated March 27, 2000, we reminded defendants that copies of any heretofore undisclosed documents or records regarding Koch's access to the law library should be forwarded to plaintiff forthwith.

ly penalizes conduct which occurred before the policy was enacted. The specific regulation at issue [11] was announced in an ADOC memorandum, dated August 1, 1997:

> The new "Department Order 806, Security Threat Groups (STG) has been placed in distribution and is effective September 2, 1997..... Among the changes in the policy are the following: ... All prior . information related to STG-like activity shall be considered in determining whether or not to validate an inmate as a member of a certified STG."

Koch statement of facts (SOF), Ex. 5; *see also* DO 806, § 806.02, subd. 1.2, attached as Ex. B to defendants' appeal from the order of the magistrate, doc # 136. According to the memo, "Validation is an objective process, and accomplished when the inmate is believed to have accumulated 10 or more points in at least two (2) of 14 validation criteria areas." *See also* DO 806, "Definitions."

In 1998, Koch's validation packet contained the following evidence: (Category F–Authorship) two reports from 1990 depicting Koch's ADOC-authorized correspondence to another inmate; (Category H–Group Photo) one photograph taken in 1981 which depicts eight members of the ADOC-authorized Rodeo Club; (Cat-

egory I—Associations) four reports from 1995 which depict Koch and others talking in the dining hall and engaging in lawful activities; (Category J–Contact) three reports from 1990 depicting ADOC-sanctioned correspondence to Koch from another inmate [12]; and (Category L–Membership) two reports, from 1995 and 1997, of Koch's name being included on a list of names found in possession of a subsequently validated inmate. *See* Plaintiff's motion to strike, dated March 30, 1999, and exhibits attached thereto. Had pre-policy conduct been excluded, there would have been insufficient evidence to validate Koch as a member of the Aryan Brotherhood. Because such evidence was not excluded, Koch contends that he is being punished retrospectively in violation of Article I, § 10, clause 1, of the United States Constitution, which dictates that "[n]o State shall ... pass any ... ex post facto Law...." He argues further that some contemporaneous misconduct should be required before STG penalties may be imposed.[13]

Defendants do not directly address Koch's argument regarding the *Ex Post Facto* Clause. Their reply brief, in fact, is replete with rhetoric emphasizing an inmate's option to avoid behavior that will result in validation.[14] This, of course,

---

11. Koch makes the same *ex post facto* argument with respect to the original validation under DMO # 57. *See* PSOF ¶ 14, (see doc # 90, Exhibit 46, D.O. # 57, at subd. 7.1) which was not to be implemented until October 1, 1995, following a 30–day warning period. We focus on the 1998 validation because the amended policy is more specific and the record is clearer, but the arguments and analysis would be nearly identical with respect to DMO # 57.

12. Koch produced evidence showing that ADOC on repeated occasions solicited his official participation in racially-specific roles. *See, e.g.,* doc # 90, exhs. 1, 2A–F, 3, 28A–B, 29A–B; doc # 124. For example, he was asked on four occasions to serve as the inmate Caucasian representative for his unit to help resolve disturbances and inmate grievances. Doc # 90, ¶¶ 7, 10, 11, 13, 17.

13. The August 1, 1997 memorandum to the inmate population confirms that "Once validated, a number of sanctions are imposed [on the inmate], and the inmate is ineligible for P/I score reduction and a housing status change, unless STG membership is successfully renounced at a future date." PSOF, Ex. 5, p. 2.

14. For example, defendants state in their reply brief, at 7, that "The STG guidelines set forth by ADOC are simple; if inmates wish to avoid being validated as members of a Security Threat Group—then they should avoid the stated indicia of membership, one of which is associating with known members of such a group, in this case the Aryan Brotherhood." Because defendants do not disclose suspect lists, however, plaintiff points out that it is also impossible to avoid present "associations" that will result in validation. Indeed, a

is impossible to do if validation may follow solely from behavior that was lawful before the policy was enacted. "One [of the purposes of the *ex post facto* prohibition] is to allow people to go about their business without fear that their behavior, though noncriminal when engaged in, will subject them to punishment....,[15] *cf. Weaver v. Graham*, 450 U.S. 24, 29 and n. 10, 101 S.Ct. 960, 964 and n. 10, 67 L.Ed.2d 17 (1981)." *Prater v. United States Parole Commission*, 802 F.2d 948, 952–53 (7th Cir.1986) (*en banc*).

Defendants also insist, however, that gang-related misconduct should not be, and is not, necessary for validation and lawful administrative segregation. "Inmate's Koch's argument is that ADOC must wait to validate inmates until ADOC 'catches' inmates committing some gang-related activity, *i.e.* murder." (Reply at 10). The state argues, in effect, that in order to *prevent* misconduct, it can place Koch in maximum security isolation based solely on his membership in a group, where "current membership" may be determined solely by past associations with known or suspected group members. This is not the way our criminal justice system works, of course, but under current law the practice may be permissible if it results from a civil correctional regulation designed to effectuate a safer prison environment.

The general standards regarding the *ex post facto* prohibition are well known. In *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), the Supreme Court explained that a law will only be prohibited by the Clause if two critical elements are present: first, the law must be "retrospective, that is, it must apply to events occurring before its enactment, and

[second] it must disadvantage the offender affected by it." *Id.* at 29, 101 S.Ct. 960. The second element generally turns on whether the law is sufficiently punitive to trigger the constitutional protections. For example, is the change substantive or just a change in procedure? Was the law intended to penalize pre-enactment conduct and, if not, what is the likelihood that the "measure of punishment" will be significantly enhanced as an incidental effect of the policy?

A law is prohibited as *ex post facto* if it "'punishes as a crime an act previously committed, which was innocent when done, ... makes more burdensome the punishment for a crime, after its commission, or ... deprives one charged with a crime of any defense available according to law at the time when the act was committed ...'" *Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990), *quoting Beazell v. Ohio*, 269 U.S. 167, 169–70, 46 S.Ct. 68, 70 L.Ed. 216 (1925); *see also Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); California Dept. of Corrections v. Morales, 514 U.S. 499, 504, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Hamilton v. U.S.*, 67 F.3d 761, 764 (9th Cir.1995); *United States v. Lozano*, 138 F.3d 915, 916 (11th Cir.1998). Thus, a statute or administrative regulation[16] may be barred as retrospective even if it alters punitive conditions outside the sentence. *Weaver*, 450 U.S. at 32, 101 S.Ct. 960. The *Ex Post Facto* Clause prohibits prison officials, for example, from imposing new or amended regulations which are themselves "punitive conditions" of confinement. *Id.* (postulating that statute requiring solitary confinement prior to execution would be barred as *ex post facto* when applied to capital offender

---

new entrant into the system could only completely avoid validation if he spoke to no one.

**15.** "The other ... is to keep legislatures out of the business—which is judicial business—of punishing people." *Prater*, 802 F.2d at 953.

**16.** If certain conditions are present, administrative rules and regulations will also be subject to the *ex post facto* prohibition. *Garner v.*

*Jones*, —— U.S. ——, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000); *see also Garner*, 120 S.Ct. at 1371 (Scalia, J., concurring in judgment) (arguing that where statute grants discretion to executive branch, charges within the scope of the discretionary enforcement authority do not implicate the *ex post facto* clause); *Prater v. United States Parole Commission*, 802 F.2d 948, 953–54 (7th Cir.1986) (*en banc*) (same).

whose offense was committed prior to the statute's enactment).

 After *CDOC v. Morales, supra, Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), and now *Garner v. Jones,* —— U.S. ——, 120 S.Ct. 1362, 146 L.Ed.2d 236 (2000), courts must evaluate (1) whether the state law or regulation produces a sufficient risk of increasing the punishment attached to the covered crimes and (2) whether the measure was carefully tailored to effectuate a legitimate regulatory purpose. To determine whether a new measure is "punitive" or merely regulatory, courts should consider whether the text and structure of the regulation evince an intent to punish or whether any additional "punishment" was merely incidental. *Russell v. Gregoire,* 124 F.3d 1079 (9th Cir. 1997). Occasionally, a regulation may be so punitive in effect as to prevent a court from legitimately viewing it as regulatory or civil in nature, despite the rulemaker's intent. *Id.* at 1086, *citing U.S. v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 2147–2148, 135 L.Ed.2d 549 (1996); *see also U.S. v. Jackson,* 189 F.3d 820, 823–824 (9th Cir. 1999) (noting relevant factors discussed in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

Beyond these general standards, we can find no case law directly applicable to Koch's allegations. The closest case we can find involved a federal prisoner who challenged the application to him of a revised policy under the Bureau of Prisons' classification system. *See Finocchiaro v. James,* 1988 WL 140865 (S.D.N.Y. Dec. 21, 1988). The scoring method under the revised system considered disciplinary reports as old as ten years, while the earlier policy looked back only two years. The court concluded that the policy was merely a discretionary guideline to aid agency discretion and thus was not a "law" subject to the *ex post facto* prohibition. Important to the court was the fact that the system did not require a prison official to transfer or

assign a prisoner to a facility simply on the basis of the classification score, and specifically authorized a transfer to a lower level institution even if the score did not recommend it. That distinction was rejected by the Court in *Garner v. Jones, supra,* when it determined that the actual risk of prolonging the inmate's incarceration was more important than the specific grant of authority to the Georgia Parole Board. *Garner,* 120 S.Ct. at 1371.

Here, ADOC policy dictates that validated inmates lose good time credits and are ineligible for custody reductions or restoration of parole class or other credits, unless they successfully renounce their STG membership. *See* DO 806.07, subd. 1.1, Koch SOF ¶ 29; *see also Chavez v. Ylst,* 1999 WL 429548 (N.D.Cal.) (finding after *Lynce* that amendment granting director discretion to decline to restore good time credits violated *Ex Post Facto* Clause when applied to inmate who had earned such credits under the earlier policy). While the record does not contain evidence of the number of validated inmates who subsequently renounce membership and regain eligibility for parole or the number of inmates who served additional time as a result of validation,[17] there is evidence in the record that renunciation places an inmate at significant risk for retaliation. *See* defendants' appeal from the order of the magistrate, doc # 136, at 4 (citing court finding in *John Does, Nos. 1–5 v. Terry Stewart,* No. CV96–486–PHX–RMB, that prison gangs place contracts on the lives of inmates who provide information to ADOC regarding their gangs). Thus, it is likely that once an inmate has been validated, the risk of indefinite segregation and ineligibility for parole, and, consequently, extended incarceration is quite high.

There are other "punitive" consequences as well. According to DO 806.07, subd. 1.1, a validated member who has refused to renounce *shall* be assigned the highest

**17.** *See Garner,* 120 S.Ct. at 1371 (requiring "evidence drawn from the rule's practical im- plementation").

public risk/institutional risk score of ⅚, ineligible for subsequent score reductions, assigned to a special management unit (SMU), ineligible for restoration of forfeited time credits, ineligible for rescission of parole class III time, ineligible for emergency escorted leave, and ineligible for work incentive pay plan wages in excess of $.20 per hour. Given that Koch has seen his P/I score elevated to ⅚ in the absence of misconduct, given the serious penalties imposed on validated inmates, and given Koch's reasonable contention that renunciation is impossible where an inmate has been erroneously validated, there is a high probability that the duration and the measure of his punishment has been increased as the result of pre-policy conduct.

■■■ However, because the penalties are imposed only upon a finding of an inmate's *current* status as a member of a security threat group, we think the policy passes constitutional muster. The "Purpose" section of DO 806 provides:

> To minimize the threat that inmate gang or ganglike activity poses to the safe, secure and efficient operation of institutions, no inmate shall create, promote or participate in any club, association, organization or gang, except as permitted by department written instructions.

*See* Defs' memo at 6. Presumably, the policy allows evidence of past acts merely to support a determination as to present status. Where "STG-like activity" is defined as acts "which detract from the safety and orderly operation of prisons," *id.* at 6, evidence of past infractions may be probative of a current propensity for such activity. Absent current, specific evidence of disassociation, it may be reasonable in many circumstances to infer that past associations with STG members continue indefinitely.

Moreover, it does not appear that the policy was drafted in order to punish inmates for past conduct. An accurate assessment of inmates likely to engage in gang-like behavior clearly facilitates a

housing and classification policy designed to minimize risk. *See Koch* SOF ¶ 29. Thus, we do not find that the policy, as drafted or when reasonably applied, violates the prohibition of the *Ex Post Facto* Clause.

## D. *Denial of Due Process*

This does not mean, however, that we believe there was sufficient reliable evidence to classify Koch as a member of the security threat group known as the Aryan Brotherhood. Under ADOC policy, a security threat group is an organization "whose members engage in activities that include, but are not limited to planning, organizing, threatening, financing, soliciting, committing or attempting to commit unlawful acts or acts that would violate the Department's written instructions, which detract from the safe and orderly operation of prisons." D.O. 806, Definitions, p. 13 (Sept. 2, 1997). Koch argues that absent evidence of "STG-like activity" his validation and consequential deprivations of liberty violated his right to due process.

Midway through this litigation, the Supreme Court altered its approach to Fourteenth Amendment due process claims brought by state prisoners. Under *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and its progeny, the existence of a state-created liberty interest turned on the character of the language employed in the state statute or regulation conferring the right. Liberty interests were created by " 'language of an unmistakably mandatory character' such that incursion on liberty [c]ould not occur 'absent specified substantive predicates.' " *Id.*, at 471–472, 103 S.Ct. 864, *quoted in Sandin v. Conner*, 515 U.S. 472, 480, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Twelve years after *Hewitt*, however, the Court observed two undesirable effects of this methodology. First, it created disincentives for States to codify prison management procedures,[18] because any arguably mandatory language could be in-

---

18. Arizona appears to be a case in point. The state legislature repealed most of its correc-
tional statutes and regulations in favor of a wide grant of discretion to the director of

terpreted as creating new, and unintended, liberty interests for state prisoners. *Sandin,* 515 U.S. at 482, 115 S.Ct. 2293. Second, the Court complained, the *Hewitt* framework led to the ill-advised "involvement of federal courts in the day-to-day management of prisons." *Id.* The Court was particularly concerned by the proliferation of lawsuits concerning "the ordinary incidents of prison life," and cited cases involving receipt of a paperback dictionary, a request for a tray lunch rather than a sack lunch, and an electrical outlet for a television.

While not overruling its cases decided under *Hewitt,* the Court abandoned the methodology in favor of an assessment of the severity of the deprivation at issue. Sandin essentially creates three tiers of protection. The most severe deprivations of liberty, particularly those "exceeding the sentence in an unexpected manner[, may] give rise to protection by the Due Process Clause of its own force." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293, *citing Vitek v. Jones,* 445 U.S. 480, 493, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). The Clause will only protect state-created liberty interests, however, where the deprivation alleged is one of "real substance," *i.e.,* one that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. Otherwise, where the complaint does not rise to the level of "real substance," prisoners must look to other constitutional provisions for protection against arbitrary state action. *Id.,* at 487 n. 11, 115 S.Ct. 2293.

We have earlier considered Koch's claim that his security reclassification violated his right to due process. In an order

dated May 21, 1998, and docketed May 27, we rejected Koch's argument that 'explicitly mandatory language' in state statutes and regulations created a liberty interest in his classification status or housing assignment. We also agreed with Judge Silver that Koch was not affected by the consent decree in *Harris v. Cardwell,* Civ-75–185–PHX CAM, in which the State stipulated that classification and custody levels were subject to due process requirements. We noted, however, that the duration of an unexplained change in security classification may impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin,* 515 U.S. at 484, 115 S.Ct. 2293. We stayed a decision on the issue pending a response from the state.

On September 1, 1998, we denied Koch's motion for a declaratory judgment because the record suggested that Koch's classification as a P–5/I–5 was not unexplained, but had resulted from his validation as a member of the Aryan Brotherhood. Our treatment of the issue did not take into account, however, that Koch's supplemental complaint includes claims based on both unexplained, atypical and allegedly retaliatory housing transfers, as well as an unjustified validation as an STG member. The unexplained housing transfers may be actionable if they were carried out as retaliation against Koch for his legal pursuits, but they are precisely the sort of indignity and inconvenience that *Sandin* would place outside the protection of the Due Process Clause. It is also clear that Koch has no liberty interest in his classification score independent of any related deprivation. *Hernandez v. Johnston,* 833 F.2d 1316 (9th Cir.1987).

ADOC, thereby minimizing the likelihood of a state-created liberty interest for prisoners incarcerated within its borders. California, however, did not take this approach and, as evidenced by the *Madrid* decision, California district courts relied upon the state's correctional regulations to find that California prisoners had a liberty interest in remaining free from administrative segregation at Pelican Bay. *See Madrid v. Gomez,* 889 F.Supp. 1146, 1271 (N.D.Cal.1995). For this reason, cases

concerning gang validation and administrative segregation in supermax facilities were treated differently by district courts in Arizona and California and by the Ninth Circuit on appeal. *Compare Madrid, supra, with Casey v. Lewis,* 837 F.Supp. 1009, 1018–1021 (D.Ariz.1993); *McFarland v. Cassady,* 779 F.2d 1426, 1428 (9th Cir.1986). The *Sandin* approach should help remedy the disparate due process protections accorded inmates across state lines.

However, with respect to the administrative segregation and attendant sanctions resulting from STG validation, Koch now argues on summary judgment that, after *Sandin*, it is incumbent upon the district court to analyze the specific segregation conditions to determine whether the prisoner has a liberty interest in remaining free from such confinement. *See Wright v. Coughlin*, 132 F.3d 133 (2d Cir.1998); *Gotcher v. Wood*, 66 F.3d 1097, 1101 (9th Cir.1995); *Whitford v. Boglino*, 63 F.3d 527, 537 (7th Cir.1995). He further alleges that the conditions and nature of his confinement in the Florence Special Management Unit (SMU) have been found by courts to impose significant and atypical hardship in relation to the ordinary incidents of prison life.[19]

▉ Koch is correct that after *Sandin* the existence of a prisoner's liberty interest in his security classification and institutional assignment will depend on a court's independent assessment of the "conditions imposed" in relation to general expecta-

tions of prison life. *Welch v. Bartlett*, 196 F.3d 389 (2d Cir.1999). The Justices dissenting in *Sandin* and a host of critics since then have noted the practical problems with such a general and subjective standard.[20] After *Sandin*, many courts have simply opted to avoid this determination, finding instead that any process owed, based on a potential liberty interest, was indeed satisfied. *See, e.g., Jones v. Moran*, 900 F.Supp. at 1275 (assuming that solitary confinement in SHU does differ significantly from the ordinary incidents of prison life in the California prison system, but finding no violation of due process); *Morris v. Cambra*, 1997 WL 811774 (N.D.Cal. Dec. 15, 1997).

Assuming that a liberty interest is implicated, Koch then argues that the amount of process due turns on whether his segregation was "disciplinary" or "administrative," *see Casey*, 837 F.Supp. at 1021, and that segregation based on STG validation is structured and treated as a disciplinary sanction.[21] Thus, he argues, he is entitled

**19.** Koch's argument here requires some inferential logic. The starting point is the decision in *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D.Cal.1995), in which the court made extensive factual findings regarding the hardships imposed on prisoners assigned to the Pelican Bay "supermax" prison in northern California. The *Madrid* court noted that Pelican Bay was modeled after the Special Management Unit in Florence, Arizona, and cited evidence that the conditions and composition of the Florence SMU caused significant adverse behavioral and psychiatric consequences. *Madrid*, 889 F.Supp. at 1228–1229, 1236. Subsequently, the court in *Snyder v. Archie*, reviewed those findings and concluded that the Pelican Bay SHU, as a matter of law, imposes "atypical and significant hardships in relation to the ordinary incidents of prison life" and therefore there is a liberty interest at stake with respect to an inmate's transfer into such conditions. *Snyder v. Archie*, (filed 2/2/98) (No. S–92–1814 GEB JFM P (N.D.Cal.)). *See also Jones v. Moran*, 900 F.Supp. 1267, 1275 (N.D.Cal.1995) (distinguishing placement in the SHU at Pelican Bay for an indeterminate term from the temporary administrative segregation at issue in *Sandin*); *McClary v. Kelly*, 4 F.Supp.2d 195 (W.D.N.Y.1998); *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir.1995); *Knox v. Lanham*, 895 F.Supp. 750 (D.Md.1995). Accordingly, Koch

concludes, Arizona inmates have a liberty interest in remaining out of analogous conditions in Florence.

**20.** *See, e.g., Sandin*, 515 U.S. at 496, 115 S.Ct. 2293 (Breyer, J., dissenting); Barbara Belbot, *Where Can a Prisoner Find a Liberty Interest These Days? The Paints of Imprisonment Escalate*, 42 N.Y.L.Sch.L.Rev. 1, (1988), Deborah R. Stagner, *Sandin v. Conner: Redefining State Prisoners' Liberty Interest and Due Process Rights*, 74 N.C.L.Rev. 1761 (1996).

**21.** In addition to the evidence discussed above regarding retrospective punishment, Koch points to the following evidence to suggest that the state considers STG segregation as more analogous to "disciplinary" segregation than "administrative" segregation: defendants' briefs use terms like "punish," "violate," and "sanctions," terms typically reserved for disciplinary decisions; the notice of the upcoming STG hearing was labeled a "statement of charges" which "accuse[s]" Koch of threat group membership; a tribunal found him "guilty"; and restricted prison store privileges are limited to those in disciplinary isolation and STG segregation, whereas other inmates in administrative segregation are given normal store privileges.

to the protections outlined in *Wolff ·v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (identifying notice and hearing requirements [22] necessary for due process in disciplinary proceedings), and in *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (identifying "some evidence" as the quantum of evidence necessary to satisfy due process in a prison disciplinary decision resulting in the loss of good time credits).

Both approaches offers greater procedural safeguards than the Ninth Circuit has required for an inmate placement in administrative segregation, prior to the *Sandin* decision. *See Toussaint v. McCarthy* (*Toussaint IV*), 801 F.2d 1080, 1103–1106 (9th Cir.1986), *cert. denied*, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). With respect to "administrative segregation," the court has instructed judges to accord wide-ranging deference to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 1104, *citing Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *See also Meachum*, 427 U.S. at 224–225, 96 S.Ct. 2532 (holding that a prisoner's conviction has sufficiently extinguished the defendant's liberty interest to empower the state to confine him in any one of its various prisons). Thus, before a prisoner

is assigned to administrative segregation, due process merely requires (1) that the prisoner be informed of the charges against him or the reasons segregation is considered, (2) that prison officials ·hold an informal nonadversary hearing within a reasonable time after the prisoner is segregated, and (3) that the prisoner be allowed to present his views. *Toussaint IV*, 801 F.2d at 1100, *citing Hewitt*, 459 U.S. at 476, 103 S.Ct. 864; *see also Toussaint v. Rowland*, 711 F.Supp. 536, 541–42 (N.D.Cal.1989) (*"Toussaint V"*), *aff'd in part, rev'd in part sub nom, Toussaint v. McCarthy*, 926 F.2d 800 (9th Cir.1990) (*"Toussaint VI"*), *cert. denied*, 502 U.S. 874, 112 S.Ct. 213, 116 L.Ed.2d 171 (1991). A prisoner in administrative segregation must also receive a periodic review of his or her confinement, but a review every 120 days satisfies due process and the timing of the reviews is appropriately subject to administrative discretion. *Toussaint VI*, 926 F.2d at 803.

■ But again, after *Sandin*, distinguishing between disciplinary and administrative actions for the purposes of defining the level of process owed a prisoner is problematic, if not inappropriate. If the issue is the relative severity of the deprivation,[23] it would seem that greater procedural safeguards are owed an inmate before he is assigned indefinitely, and absent misconduct, to administrative segregation

---

**22.** *Wolff* requires that an inmate be given advance written notice of the disciplinary charges "to enable him to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 564, 94 S.Ct. 2963. Second, "at least a brief period of time after the notice, no less than 24 hours, should be allowed to the inmate to prepare for the appearance before the [disciplinary committee]." *Id.* Third, "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Id., quoting Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Fourth, "the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Id.* at 566, 94 S.Ct. 2963; *see also Ponte v. Real*,

471 U.S. 491, 495, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985); *Zimmerlee v. Keeney*, 831 F.2d 183, 187 (9th Cir.1987), *cert. denied*, 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988).

**23.** *See Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir.1996) (noting that the focus of *Sandin* is on the conditions of the inmate's confinement); *Arce v. Walker*, 139 F.3d 329, 334–35 (2d Cir.1998) (*Sandin* "established an analysis under which the degree and duration of an inmate's restraint are the key considerations to determine the existence of a state-created liberty interest"); *Williams v. Ramos*, 71 F.3d 1246, 1249 (7th Cir.1995) (*Sandin* "shifts the creation of liberty interests away from the language of regulations and toward the nature of the deprivation a prisoner suffers.").

in a supermax facility (with its consequential loss of parole eligibility and earned early release credits), than before a short-term and less onerous "disciplinary" sanction is imposed for actual misconduct.[24] *Sandin* was an attempt to return to basic due process principles which stress proportionality and a balancing of the interests involved.[25] More process is due where the deprivation is greatest.

■ With this in mind, we think that at the very least there must be some reliable evidence of *current* STG membership before the state may impose the conditions of confinement stated in DO 806.07, subd. 1.1. *See Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); *Toussaint IV*, 801 F.2d at 1105–06; *Madrid v. Gomez*, 889 F.Supp. 1146, 1273–1274, 1277. "Requiring modicum of evidence to support a decision to revoke good time credits will help to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens." *Hill*, 472 U.S. at 455, 105 S.Ct. 2768. Further, the evidence relied upon to confine an inmate to the Florence SMU for gang affiliation must have "some indicia of reliability" in order to satisfy due process requirements, *Cato v. Rushen*, 824 F.2d 703 (9th Cir.1987); *Madrid*, 889 F.Supp. at 1273–74, and must support, though not mandate, the inference drawn by prison officials. Absent some limited opportunity to review the sufficiency of the evidence, the *ex post facto* concerns raised above would be paramount. Finally, our conclusion is supported by the special consideration the Court has given to penalties or changes in the law involving parole eligibility or the loss of good time credits because both have the potential to lengthen an inmate's imprisonment. *See, e.g., Hill,* 472 U.S. at 454, 105 S.Ct. 2768; *Sandin,* 515 U.S. at 487, 115 S.Ct. 2293.

■ For these reasons, we must deny the parties' motions for summary judgment on the due process claims arising out of Koch's validation and the penalties imposed as a consequence. Questions of fact remain as to whether his indefinite assignment to the Florence SMU, his ineligibility for parole and restoration of forfeited good time credits, and the other conditions imposed *absent misconduct* represent an atypical hardship in relation to those endured by prisoners in the general population as well as those in administrative, disciplinary, and protective confinement. *See Welch,* 196 F.3d at 393.

An issue of fact also remains as to whether there was some reliable evidence to suggest that Koch was indeed a current member of the Aryan Brotherhood. According to defendants, plaintiff was validated based upon several criteria, including Authorship, Group Photos and Membership. (Defs' memo in support of motion for summary judgment, at 8). ADOC's own report entitled " Result of STG Validation Hearing," dated March 11, 1998, however, indicates that the committee chose to disregard the Authorship category. Moreover, the defendants have presented no evidence which would suggest that the 17–year–old rodeo photo is evidence of current gang membership, nor is there an explanation as to why the hand-printed lists found among the possessions of two fellow inmates are sufficient to raise an inference of Koch's membership in the Aryan Brotherhood given that the lists also include the names and phone numbers of women,

---

24. *See* Scott N. Tachiki, *Indeterminate Sentences in Supermax Prisons Based Upon Alleged Gang Affiliations: A Reexamination of Procedural Protection and a Proposal for Greater Procedural Requirements,* 83 Calif.L.Rev. 1115 (1995) (arguing, *inter alia,* that some evidence of misconduct should be a predicate for segregation on the basis of gang affiliation).

25. *See Sandin,* 515 U.S. at 478, 115 S.Ct. 2293 (noting that *Wolff*'s principal contribution "to the landscape of prisoners' due process derived ... from its intricate balancing of prison management concerns with prisoners' liberty in determining the amount of process due").

Hispanics, and persons not deemed STG suspects. (PSOF, Ex. 7, at pp. 3–7.). Plaintiff argues persuasively that because the two lists were made before either inmate was validated, because there is no evidence that the lists were indeed Aryan Brotherhood membership lists, and because Koch appears on many lists because of his ADOC-solicited role as a Caucasian legal assistant and troubleshooter, the lists should not be considered as reliable evidence of his membership in a gang. We also note that Koch was denied the right to present witnesses who would testify that Koch's name did *not* appear on other alleged Aryan Brotherhood membership lists.

As to the defendants' alleged failure to provide adequate notice or *Wolff*-based procedural safeguards, Koch has not presented sufficient evidence to survive defendants' motion for summary judgment, with the exception of the circumstances surrounding the first STG validation hearing. Most of those issues, however, will be subsumed by the retaliation claims and, because Koch was ultimately re-validated under DO 806, the legitimacy of his current deprivation will be analyzed based on the 1998 finding of STG membership.

### E. *First Amendment Claims*

 Plaintiff also argues that DO 806 prohibits lawful association and that the renunciation requirement violates his right to religious expression, or, more precisely, his right not to speak. Prison regulations generally clear First Amendment hurdles without much discussion. A prison inmate retains only those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system, *Pell v. Procunier*, 417 U.S. 817, 822, 94

S.Ct. 2800, 41 L.Ed.2d 495 (1974), and even those are subject to major restrictions in order to accommodate the needs and objectives of the prison, *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129–30, 97 S.Ct. 2532, 53 L.Ed.2d 629, (1977). "[S]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Id.* at 128, 97 S.Ct. 2532, *quoting Pell*, 417 U.S. at 827, 94 S.Ct. 2800.

 As to plaintiff's contention that his Christian beliefs forbid his acting as an informant regarding other prisoners, we note that at least one circuit court has concluded that a self-described religious sect may be classified in its entirety as a security threat group based, in part, on principles espoused by the adherents. *See In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464 (4th Cir.) (specifically rejecting First Amendment challenge to "renunciation" provision), *cert. denied sub nom, Mickle v. Moore*, —— U.S. ——, 120 S.Ct. 179, 145 L.Ed.2d 151 (1999). While there may be other problems with the renunciation requirement,[26] Koch's First Amendment challenge to the policy does not survive our deferential review. Finally, Koch's claim under the Religious Freedom Restoration Act of 1993, codified at 42 U.S.C. § 2000bb–1 *et seq.*, must be dismissed in light of the Supreme Court's decision in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), finding the Act unconstitutional.

---

**26.** Not the least of these problems is a likely death threat to inmates who comply. Wrongfully classified members, while entitled to a periodic review, have a hollow remedy indeed, given that they cannot effectively renounce a membership they never embraced. If "renunciation" is merely a way to force inmates to implicate other inmates on the record, the system has little assurance of reliability or truthfulness, but rather rewards the fabrication of evidence. The potential for abuse of such a system has been well-documented. *See Madrid*, 889 F.Supp. at 1273–74; Tachiki, *Indeterminate Sentences, supra* n. 24, at 1137–46.

### F. Defendants' Qualified Immunity

Defendants argue that the case should be dismissed because prison officials are entitled to qualified immunity. They argue that defendants did not objectively violate any of Koch's clearly-established constitutional rights. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). On the retaliation claims (retaliatory transfer, retaliatory initiation of validation proceedings) qualified immunity is unavailable, as the prohibition against retaliatory punishments is "clearly established law" in the Ninth Circuit. *See Rizzo v. Dawson,* 778 F.2d 527 (9th Cir. 1985); *Barnett v. Centoni,* 31 F.3d 813, 815–16 (9th Cir.1994); *Schroeder v. McDonald,* 55 F.3d 454, 461 (9th Cir.1995). As for denial of access to the courts, outstanding questions of fact preclude summary judgment on the defendants' qualified immunity. It remains to be seen knowledge of plaintiff's alleged legal predicament or whether there was a willful attempt to knowledge of plaintiff's alleged legal predicament or whether there was a willful attempt to deny him access to the courts.

### Conclusion

It would be an understatement to say that prison management is difficult. The Arizona Department of Corrections is required to meet the legitimate security concerns of public citizens, corrections officers, and prison inmates without compromising the civil rights retained by individuals even after conviction for unspeakable and detestable criminal activity. It is because this job is so difficult that federal courts owe significant deference to corrections officials, who know much better than we do how to run a prison. With that said, however, it is also our duty to uphold the constitutional commands and remedy unlawful violations of an individual's civil rights. Mark Koch has overcome significant procedural obstacles to pursue this action over the past ten years. We conclude that he has more than adequately met his burden to provide "significant probative evidence tending to support the [supplemental] complaint." *See Barnett,* 31 F.3d at 815.

Consistent with the foregoing discussion, we deny the parties' motions for summary judgment on the denial of access and retaliation claims, finding that genuine issues of material fact remain which must be submitted to a trier of fact. We grant defendants' motion for summary judgment on the other First Amendment claims (religious expression and freedom of association) and the *ex post facto* claim. On the due process claims, defendants' motion is granted in part and denied in part. We reject Koch's contention that that notice and hearing procedures were inadequate, as well as his argument that STG validation requires a finding of misconduct,[27] but find that he may have a liberty interest in remaining free from the consequences of such validation. If he does have a liberty interest, we believe the validation decision must be supported by some reliable evidence of current gang membership.

---

**27.** Although championing prisoners' rights has never earned great political favor, it may be that financial and security considerations will ultimately push ADOC toward a more rational approach to incentivizing good prisoner behavior, as the Arizona Legislature has stated it desires. *See* A.R.S. § 41–1604(A)(8) (instructing the Director of ADOC to adopt rules "for the development of incentives to encourage good behavior and the faithful performance of work by prisoners"). A policy which penalizes inmates absent misconduct (while rewarding the fabrication of evidence against other inmates) may actually undermine prison operations. *See* Phillip Kassel. *The Gang Crackdown in Massachusetts Prisons: Arbitrary and Harsh Treatment Can Only Make Matters Worse,* 24 New Eng.J. on Crim. & Civ. Confinement 37 (1998) (arguing as a matter of policy that segregation on the basis of security threat groups actually results in heightened prison security problems).