**Mark A. KOCH, Plaintiff,**

v.

**Samuel LEWIS, et al., Defendants.**

**No. CIV90–1872–PHX–ROS–(JBM).**

United States District Court,
D. Arizona.

Aug. 30, 2001.

---

Lawrence A. Hammond, Timothy Joel Eckstein, Phoenix, AZ, for plaintiff.

Alicia Marie Lawler, James Russel Morrow, Phoenix, AZ, for defendants.

Rene Lynn Williams, Phoenix, AZ, for movant.

## MEMORANDUM OPINION AND ORDER

MORAN, Senior District Judge.

This is the most recent chapter in the saga of Arizona prisoner Mark Koch. His epic journey through the state and federal courts has been documented elsewhere and we will not recount it here. Suffice it so say that Koch is the subject of no fewer than 14 state and federal court opinions spanning 20 years of litigation and hundreds of pages of published and unpublished decisions.[1] In this opinion we take up the issue whether Koch's indefinite detention in near-solitary confinement based on alleged gang membership comports with the Due Process Clause of the Fourteenth Amendment. For the reasons set forth below, we hold that it does not and

we therefore grant Koch's motion for injunctive relief.

### BACKGROUND

Since March 1996, Koch has been detained in Special Management Unit II (SMU II) of the Arizona Department of Corrections (ADOC) facility in Florence, Arizona. He is there because he has been validated as a member of the Aryan Brotherhood (AB) prison gang. While Koch has raised a number of claims during the course of this lawsuit, by the time his case went to trial on April 17, 2001, only two issues remained: 1) whether Koch's indefinite confinement in SMU II based on his status as an AB member violates the Due Process Clause; and 2) whether the individual defendants[2] could be held liable for money damages as a result of any such constitutional breach.

Trial commenced on April 17, 2001. The testimonial and documentary evidence established the following. Prior to 1996, Koch was designated as a relatively low-risk inmate and housed in a number of different medium-security facilities within the ADOC. At these facilities Koch was allowed to spend several hours of each day outside of his cell and was able to interact with other prisoners during recreation time in the prison yard and while taking meals in the dining hall. Koch also had the opportunity to take advantage of educational and employment programs. With respect to the latter, Koch worked for several years as a staffer in prison law libraries and as a legal assistant and adviser to other inmates.[3]

1. Those interested in the full story should consult *Koch v. Lewis,* 96 F.Supp.2d 949 (D.Ariz.2000) (summarizing the present litigation), as well as *State v. Koch,* 138 Ariz. 99, 673 P.2d 297 (1983), *Vaughan v. Ricketts,* 950 F.2d 1464 (9th Cir.1991), and their subsequent histories.

2. Like the substantive claims in this lawsuit, the identity of the defendants has been a moving target from the start. At present (as at trial) there are three named defendants: Terry L. Stewart (Stewart), director of the ADOC since December 1995 and formerly the

assistant director of the ADOC; George Herman (Herman), warden of the Winslow complex in 1995 and 1996 and presently warden of the Eyman complex, which includes SMU II; and Denny Harkins (Harkins), deputy warden of the Winslow/Kaibab Unit in 1995 and 1996. Former ADOC director Samuel Lewis was dropped as a named defendant shortly prior to trial.

3. Koch's prison legal practice has been remarkable. *See Koch,* 96 F.Supp.2d at 952 n. 4 (discussing the *Vaughan* litigation). Indeed, for much of the life of this lawsuit Koch

Things changed dramatically for Koch in 1996. In January of that year, prison officials notified Koch that he had been identified as a suspected member of the Aryan Brotherhood, a prison gang designated by the ADOC as a Security Threat Group (STG) (Koch Exh. 1.5). Under Department Management Order 57 (DMO 57), which was effective at the time, a prisoner validated as a member of an STG was given a level 5 institutional risk score (the highest level) and placed in segregated confinement in SMU II (Koch Exh. I.8). In February 1996, defendants conducted a validation hearing regarding Koch's alleged STG membership. At that hearing, during which Koch received little notice or details of the charges against him, defendants validated Koch as a member of the Aryan Brotherhood STG. Pursuant to DMO 57, Koch subsequently was assigned a level 5 institutional risk score and transferred to SMU II.

The ADOC held another validation hearing for Koch in 1998. Following Department Order 806 (DO 806), which had by then replaced DMO 57,[4] the ADOC cited three categories of evidence in support of validation: 1) a photograph of Koch posing with alleged AB members; 2) incident reports noting that Koch had been observed associating with known AB members; and 3) purported membership lists identifying Koch as an AB affiliate. No evidence of any overt acts of misconduct was introduced against Koch at the 1998 hearing.

At the end of the proceeding, the ADOC concluded that the evidence had confirmed Koch's status as an STG member and that he warranted continued detention in SMU II. DO 806 provides that Koch must remain in SMU II unless and until he renounces his membership in the Aryan Brotherhood and submits to a debriefing process (Df.Exh. 514). In other words, Koch must name names. Koch has refused to do so. He has now been detained in SMU II for more than five and one-half years.

Life in SMU II is grim.[5] The ADOC maintains that SMU II is the most restrictive form of confinement in the state of Arizona and the most secure super-maximum security prison in the United States (Stewart Dep. at 6). In SMU II, Koch is housed in a windowless cell measuring approximately 10 × 8 feet. The cell contains a bed, a sink and a toilet. SMU II was designed to minimize human contact. To that effect, all meals are delivered to Koch in his cell and, with few exceptions, Koch must remain in his cell 24 hours per day. For one hour every other day Koch is handcuffed, shackled and allowed out of his cell for exercise and a shower. The shower room is located approximately 20 feet down the hall from Koch's cell. There, he is allotted eight minutes of water time to shower and shave. The "recreation area" is approximately ten feet away from Koch's cell. This area consists of a 12 × 20 foot empty room with 20 foot high

argued that prison officials placed him in SMU II and subjected him to other forms of mistreatment in retaliation for his success as a jailhouse lawyer. Koch withdrew this claim before trial, however, so the retaliation theory is no longer part of this litigation.

4. ADOC director Stewart promulgated DO 806 in September 1996 to replace DMO 57. DO 806 was amended in September 1997. Among other changes, the new regulation eliminated the ability of an STG member to obtain inactive status and provided that de-

briefing was the only way a validated STG member could reduce his institutional risk score and become eligible for transfer out of SMU II (Df.Exh. 516). At trial, Stewart stated that one of the motivations for enacting the new regulation was the low number of validations achieved under DMO 57.

5. In addition to hearing testimony from the parties regarding the conditions at SMU II, we made a personal visit to the facility on April 20, 2001.

walls and a mesh grate ceiling. Other than the shower and exercise time, Koch is allowed to leave his cell to make one phone call per week (the phone is located near the shower room) and, if there are visitors, for up to two hours of visitation time per week. Communication with visitors must take place through a plate glass window. Visitors to SMU II, including medical personnel, must wear bulletproof jackets and protective eye goggles (Stewart Dep. at 12–13, 17–20; Herman Dep. at 17–34).

Koch has existed under these conditions for 66 consecutive months. Koch is serving a sentence of 25 years to life. His status as an STG member and the concomitant level 5 institutional risk score effectively foreclose any possibility of parole. Therefore, unless he debriefs, Koch will remain in SMU II until he dies. The alternative of debriefing, however, presents its own problems. Debriefers are targeted for execution by gang members. In an attempt to provide security the ADOC places debriefers in protective custody in SMU I—a similarly restrictive segregated facility (Herman Dep. at 8). Thus, although ADOC policy in theory provides for a means of release from SMU II, the reality for Koch is that he is likely to remain in what amounts to solitary confinement for the rest of his life.

Given the severity of the conditions in SMU II and the indefinite nature of Koch's confinement there, the question presented is whether the Constitution permits such segregation based solely on Koch's status as an STG member. After three days of trial it was abundantly clear that even if Koch's detention violates due process, there were no clearly established constitutional rules on the subject when Koch was validated as an AB member and placed in SMU II. Therefore, on April 20, 2001, we granted defendants' motion to dismiss Koch's individual capacity claims based on the doctrine of qualified immuni-

ty. See Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Having dismissed all claims for money damages, we then discharged the jury and retained jurisdiction over Koch's claim for injunctive relief—the only remaining part of this lawsuit. We instructed the parties to submit supplemental briefing on the issue whether the Due Process Clause warrants injunctive relief in this case. The parties have now completed their post-trial briefs.

## DISCUSSION

■ The framework for our analysis is straightforward. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), and its progeny establish a two-part inquiry. We must first determine whether Koch's indefinite detention in SMU II implicates a constitutionally-protected liberty interest. If we conclude that it does we must then examine the procedural and evidentiary safeguards afforded to Koch in order to decide whether there has been a deprivation of due process. *See Zimmerlee v. Keeney,* 831 F.2d 183, 186 (9th Cir.1987), *cert. denied,* 487 U.S. 1207, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988); *Madrid v. Gomez,* 889 F.Supp. 1146, 1270 (N.D.Cal.1995).

### I. *Is There a Liberty Interest·At Stake?*

■ As we discussed at length in our prior opinion, the *Sandin* decision worked a fundamental change in the way courts determine whether an inmate possesses a constitutionally-protected liberty interest. *See Koch,* 96 F.Supp.2d at 961–66. Specifically, *Sandin* abandoned the mandatory/permissive analysis of *Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), in favor of an inquiry focusing on the nature of the deprivation suffered by the inmate. *Sandin,* 515 U.S. at 481, 115 S.Ct. 2293; *see Mitchell v. Dupnik,* 75 F.3d 517, 522 (9th Cir.1996) ("*Sandin* ... refocused the test for deter-

mining the existence of a liberty interest away from the wording of prison regulations and toward an examination of the hardship caused by the prison's challenged action relative to 'the basic conditions' of life as a prisoner."). Thus, after *Sandin*, a state-created liberty interest arises when the prison's conduct toward the inmate imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293.[6]

Defendants initially argue that *Sandin* did not discard *Hewitt's* methodology as much as it added an additional requirement to the basic test. *Hewitt* held that mandatory language in a prison regulation could give rise to a liberty interest whereas permissive language could not. *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. 864. Defendants contend that after *Sandin* an inmate must prove that he has suffered an atypical and significant hardship in addition to establishing the existence of a mandatory regulation. Applying this reading of *Sandin*, defendants conclude that because the state of Arizona has abolished all mandatory-language prison regulations, *see* *McFarland v. Cassady*, 779 F.2d 1426, 1428 (9th Cir.1986), there is no foundation upon which Koch can construct a *Sandin*-based liberty interest in this case.

Defendants are correct only to the extent that some courts have held that the existence of a state regulation remains necessary in the post-*Sandin* world. *See* *Castaneda v. Marshall*, 1997 WL 123253, at *3 (N.D.Cal. Mar.10, 1997), *aff'd*, 142 F.3d 442 (9th Cir.1998); *Sandefur v. Lewis*, 937 F.Supp. 890, 895 (D.Ariz.1996); *Jones v. Moran*, 900 F.Supp. 1267, 1273–74 (N.D.Cal.1995). Other post-*Sandin* courts, however, have not looked for a predicate state regulation and in an unpublished decision the Ninth Circuit held that restraints imposing atypical or significant hardship are sufficient "whether regulated by mandatory language in prison codes *or not.*" *Pifer v. Marshall*, 1998 WL 81335, at *1 (9th Cir. Feb.24, 1998) (unpublished) (emphasis added); *see* *Acker v. Maxwell*, 1997 WL 311948, at *2 (9th Cir. Jun.3, 1997) (unpublished) ("We no longer examine the language of prison regulations to determine whether such regulations place substantive restrictions on officials' discretion.");[7] *Galvaldon v. Marshall*, 1997 WL 765955, at *5 (N.D.Cal. Nov.12, 1997); *Hart v. Cambra*, 1997 WL 564059, at *3 (N.D.Cal. Aug.22, 1997), *aff'd*, 161 F.3d 12 (9th Cir.1998). In any event, *Sandin* represents a far more significant departure from *Hewitt's* methodology than defendants would acknowledge. While some form of state regulation may yet be necessary to trigger a liberty interest, the sort of mandatory language necessary under *Hewitt* is no longer a prerequisite.[8]

---

6. In addition to state-created rights, the Due Process Clause can give rise to a liberty interest of its own force. *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293. This protection generally is reserved for the "most severe deprivations of liberty, particularly those 'exceeding the sentence in an unexpected manner,'" *Koch*, 96 F.Supp.2d at 962 (*quoting Sandin*, 515 U.S. at 484, 115 S.Ct. 2293). While courts have not located a right to remain in general population or to be free from administrative segregation within this special class, we observe, without holding, that the indefinite SMU II detention endured by Koch may well qualify as the sort of extreme deprivation that would give rise to a liberty interest from the Due Process Clause itself.

7. Although they may be illustrative of the Ninth Circuit's thinking on this subject, we cannot and do not rely on these two unpublished opinions as binding precedent. *See* Ninth Circuit Rule 36–3.

8. The Ninth Circuit has not held that a mandatory language regulation remains a requirement after *Sandin*. Significantly, recent due process cases out of Arizona have not held

DMO 57 and DO 806 establish specific procedures for STG validation. These regulations denote what sort of evidence is acceptable at a validation hearing and what procedures must be afforded to an inmate prior to validation. For example, the regulations mandate that prison officials shall notify the inmate of the evidence against him, provide him with an opportunity to be present at the validation hearing, and ensure that the criteria used to support validation are based on specific documentary or physical evidence. (DMO 57 at § 6.7; DO 806 at § 806.04). In short, the regulations place limitations on the ability of prison officials to validate an inmate as an STG member and place him in SMU II. Although DMO 57 and DO 806 were not mandatory enough to support a liberty interest under *Hewitt,* they are sufficient to form the bases of a liberty interest under *Sandin.* This is not to say that regulatory language retains much significance in the modern due process analysis. *Sandin* directs us to focus largely, if not entirely, on the nature of the deprivation.[9] Insofar as a *Sandin*-based liberty interest is conditioned on the existence of some form of state regulation that limits the prison's power to impose constraints, the hurdle is low and Koch easily clears it in this case.

This brings us to the heart of the liberty inquiry—whether Koch's indefinite placement is SMU II constitutes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." The *Sandin* test requires a case-by-case examination of both the conditions of the inmate's confinement and the duration of the deprivation at issue. *Sandin,* 515 U.S. at 486, 115 S.Ct. 2293; *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir.1996), *amended by* 135 F.3d 1318 (9th Cir.1998); *see Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In Koch's case, the deprivation is extreme in both degree and duration. SMU II imposes some of the most draconian conditions that can be found in a modern American prison.[10] Koch is confined to his cell for 165 out of 168 hours per week. He takes all meals alone in his cell. For the three hours a week he is allowed out of his cell, Koch is placed in restraints and allowed to walk 20 feet down the hall in one direction for an eight-minute shower and ten feet down the hall in the other direction to the empty exercise room. His only view of the outside world is through the mesh roof of the recreation room. Prior to his trial Koch had not seen the horizon or the night sky for more than five years. SMU II reduces human contact to a minimum. Koch is not allowed to interact with other prisoners or to participate in any educational, vocational, or employment activities. His only face-to-face contact is with ADOC officials. A visitor to SMU II must remain behind a plate glass window or, on the rare occasions that an individual enters SMU II, must wear a bulletproof vest and protective eye gog-

---

that Arizona's permissive prison code forecloses the possibility of a constitutionally-protected liberty interest. See *Acker, 1997* WL 311948, at *2; *Sandefur,* 937 F.Supp. at 895–96.

9. In doing so, *Sandin* ushered in a welcome change in the legal landscape of this subject. Prior to *Sandin,* for example, a trivial deprivation in California's penal system could rise to the level of a constitutionally-protected liberty interest solely based on the existence of the mandatory prison regulations of that

state, while alarming deprivations (like indefinite placement in SMU II) would raise no due process concerns in Arizona because of that state's discretionary prison code. See *Koch,* 96 F.Supp.2d at 962 n. 18.

10. For a more detailed description of the conditions within SMU II, we refer the reader to Judge Henderron's compelling narrative in *Madrid v. Gomez,* 889 F.Supp. 1146, 1227–1230 (N.D.Cal.1995) (describing the California facility that was modeled on SMU II).

gles. Trial provided Koch his first opportunity to initiate voluntary, physical contact with another human being for more than five years.

Not surprisingly, the severe conditions of SMU II have adverse psychological consequences. *See Miller v. Stewart*, 231 F.3d 1248, 1252 (9th Cir.2000) ("it is well accepted that conditions such as those present in the SMU II ... can cause psychological decompensation to the point that individuals may become incompetent"); *Comer v. Stewart*, 215 F.3d 910, 915 (9th Cir.2000) ("we and other courts have recognized that prison conditions remarkably similar to [SMU II] can adversely affect a person's mental health"); *Madrid*, 889 F.Supp. at 1230 (discussing the psychological deterioration that results from isolation in SMU-like conditions); *see also McClary v. Kelly*, 4 F.Supp.2d 195, 208 (W.D.N.Y.1998) ("[the notion that] prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science."). The expert testimony submitted by the parties served to confirm the obvious. At trial, Koch's expert testified that isolation in SMU II causes a detrimental pathological effect on the inmate. Defendants' witnesses quibbled with the degree of harm imposed by SMU II, but essentially agreed that extended isolation in SMU II subjects the inmate to heightened psychological stressors and creates a risk for mental deterioration. *See* Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477 (1997) (summarizing literature on the effect of SMU-like conditions).

A short stay under the severe conditions of SMU II may not raise due process concerns.[11] But here, Koch has been confined to SMU II for five and one-half years. This clearly is long enough to trigger a liberty interest. *See Colon v. Howard*, 215 F.3d 227, 230–32 (2d Cir.2000) (discussing cases and holding that 305–day confinement satisfied the *Sandin* standard); *Shoats v. Horn*, 213 F.3d 140, 143–44 (3d Cir.2000) (holding that segregation for eight years triggered due process rights). Furthermore, Koch will remain in SMU II indefinitely. DO 806 provides that debriefing is the only way for a validated STG member to become eligible for release from SMU II. (DO 806 at § 806.06). This was not the case under DMO 57, which provided for periodic assessments of whether an inmate warranted continued SMU detention. (DMO 57 at §§ 6.9, 6.10). Nor is it ADOC's practice to indefinitely confine inmates in the SMU for disciplinary violations; those inmates generally are assigned to the SMU for a six-month term and may achieve lower custody through good behavior. Defendants contend that Koch similarly is not serving an indefinite term because the debriefing option provides Koch with the "key to his own cell." At trial, however, director Stewart and others conceded that since debriefers are subject to reprisals from gang members they are not released from SMU II into the general population. Instead, for their own safety, debriefers are moved from SMU II to SMU I. No debriefer has ever been transferred back to the general population. Thus, debriefing does not represent a means for release from solitary confinement. The reality is that Koch will remain in the SMU for an indefinite, likely permanent, term.

**11.** We do not rule out the possibility that certain stays in SMU II will trigger liberty interests regardless of duration. *See Sealey*, 197 F.3d at 586 ("especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical.").

**1002**

We hold that Koch's five and one-half years of confinement under the extreme conditions of SMU II, with no end in sight, gives rise to a protected liberty interest under *Sandin.* There is little doubt that Koch has been subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293; *see Shoats,* 213 F.3d at 144 ("we have no difficulty concluding that eight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life"). In a series of cases arising out of the Security Housing Unit (SHU) of Pelican Bay State Prison in California, courts repeatedly have assumed that indefinite segregation based on gang membership implicates a constitutionally-protected liberty interest. *See Rhinehart v. Gomez,* 1998 WL 410891, at *2 (N.D.Cal. Jul.16, 1998) ("an indeterminate term of segregation in the SHU . . . suggests sufficient severity to implicate procedural due process protection"); *Williams v. Cambra,* 1998 WL 387617, at *2 (N.D.Cal. Jul.9, 1998) (same); *see also Renteria v. Gomez,* 1999 WL 1051948, at *1 (N.D.Cal. Nov.9, 1999) (assuming liberty interest at stake); *Castaneda,* 1997 WL 123253, at *4 (same); *Hart,* 1997 WL 564059, at *3 (same). Pelican Bay's SHU was modeled on Florence's SMU. If indefinite segregation in the SHU satisfies *Sandin,* we see no reason why a different conclusion is warranted when it comes to SMU II.[12]

Relying heavily on *Resnick v. Hayes,* 213 F.3d 443 (9th Cir.2000), defendants argue that Koch cannot establish a liberty interest because the conditions in SMU II are essentially the same as the conditions in other segregated units in Florence. *See Resnick,* 213 F.3d at 444–45; *see also Sandefur,* 937 F.Supp. at 896. We do not agree that *Resnick* compels such a conclusion. First, the plaintiff in *Resnick* was placed in Pelican Bay's SHU for 70 days pending a disciplinary hearing. Koch has been confined to SMU II for more than five and one-half years and is likely to stay there until he dies. This is enough of a difference to render *Resnick* inapposite. Second, the plaintiff in *Resnick* did not allege that the SHU was materially different from conditions imposed on inmates in discretionary segregation or the general population, nor did he contend that the SHU created a major disruption in his environment. In contrast, Koch has demonstrated quite forcefully that his existence in SMU II bears little resemblance to his prior prison life outside of that facility. Measured by both degree and duration, Koch has suffered a form of detention that is far worse than the conditions experienced by the typical inmate. Put simply, five and one-half years of isolation in SMU II far exceeds "what one could expect from prison life generally." *Williams v. Ramos,* 71 F.3d 1246, 1249 (7th Cir.1995).

Prisons are in the business of depriving liberty. And federal courts are to tread lightly with respect to prison management. We are neither unaware of nor naive to these realities. Even so, the Constitution

12. Although the complaint does not allege an Eighth Amendment claim, the Ninth Circuit has advised courts Implementing *Sandin* to look to Eighth Amendment principles for guidance. *See Keenan,* 83 F.3d at 1089. Detention in SMU II for five and one-half years borders on cruel and unusual punishment. *See Madrid,* 889 F.Supp. at 1260–67 (conditions in Pelican Bay's SHU do not constitute a *per se* Eighth Amendment violation, although "the SHU may press the outer bounds of what most humans can psychologically tolerate"); *see also Delaney v. DeTella,* 256 F.3d 679, 683–84 (7th Cir.2001); *Davenport v. DeRobertis,* 844 F.2d 1310, 1314 (7th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).

watches over prisons and their inmates. Koch has been confined in SMU II for 66 months and counting. Risking understatement, we conclude that this deprivation is severe enough to engage the Due Process Clause.

## II. *Has There Been a Due Process Deprivation?*

■ Having determined that a liberty interest is at stake, we look next to see if Koch was given all the process he was due under the Fourteenth Amendment. The Due Process Clause provides inmates with two types of safeguards. The first category consists of procedural protections. Generally, an inmate designated for placement in segregated confinement must receive adequate notice, an opportunity to be heard, and periodic review. *See Wolff v. McDonnell,* 418 U.S. 539, 563–70, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Toussaint v. McCarthy,* 801 F.2d 1080, 1100 (9th Cir. 1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987).[13] The second type of safeguard consists of evidentiary protections. Prison officials cannot deprive an inmate of a constitutionally-protected liberty interest absent a sufficient evidentiary basis. The Supreme Court has held that, at the very least, there must be "some evidence in the record" supporting the decision to segregate an inmate. *Superintendent v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). Furthermore, the evidence relied upon must have "some indicia of reliability."

*Cato v. Rushen,* 824 F.2d 703, 705 (9th Cir.1987). These evidentiary protections operate "to prevent arbitrary deprivations without threatening institutional interests or imposing undue administrative burdens." *Hill,* 472 U.S. at 455, 105 S.Ct. 2768.

■ At this stage in Koch's lawsuit, only the evidentiary component of due process remains relevant. Koch is being confined in SMU II based on the 1998 validation hearing. He makes no allegations of procedural deficiencies in connection with that hearing. In his brief Koch points to the numerous procedural shortcomings of the 1996 validation hearing. But those failings are no longer relevant, as the only claims remaining in this lawsuit are for injunctive relief and Koch's present detention in SMU II stems from the 1998 validation hearing. Thus, the procedural component of due process is not at issue. The focus here is on the evidentiary element, *i.e.,* whether defendants presented "some evidence" with "indicia of reliability" sufficient to justify placing Koch in SMU II for an indefinite (likely permanent) term.

Koch was validated as an STG member at the 1998 validation hearing based on three types of proof: a group photograph, evidence of associations, and membership lists. The photograph was taken in 1981 at a prison rodeo event and depicts Koch posing with other inmates known to ADOC officials as members of the Aryan Brotherhood. At trial, Harkins testified that AB

---

**13.** Prior to *Sandin,* courts distinguished between disciplinary and administrative segregation, holding that stringent *Wolff*-based procedures were required prior to disciplinary confinement while relatively relaxed *Toussaint*-style procedures were sufficient in the context of administrative segregation. Courts in the Ninth Circuit required the lesser form of procedural protections prior to segregation of an inmate based on gang membership because they considered such confinement administrative rather than disciplinary. As we

indicated in our prior opinion, however, *Sandin* marked a departure from rigid, categorical divides in favor a more fluid approach based on the nature of the deprivation. *Koch,* 96 F.Supp.2d at 964–65; *see Keenan,* 83 F.3d at 1089 (holding that "the old mandatory/discretionary and punitive/administrative dichotomies" are no longer relevant after *Sandin*). We therefore doubt the continuing efficacy of differentinting between disciplinary and administrative segregation when determining what level of process is owed to an inmate.

members do not pose in photographs with individuals who are not associated with the gang. On the other hand, Koch submitted evidence indicating that prison officials commended him for his role in putting on the rodeo and that they made no inquiry at the 1998 hearing regarding the context of the photograph or whether it was gang-related. The "association" evidence consisted of four observations of Koch in the company of known AB members. Defendants do not contend to know what was discussed in these encounters but testified that, based on their experience, talking to or dining with gang members establishes affiliation with the gang. Finally, defendants relied on two lists seized from known AB inmates which largely contain the names of known AB members (how largely is in some dispute) and include Koch. (Koch Exhs. I.12–15). This represented the sum total of evidence introduced by the ADOC at the 1998 validation hearing. There was no evidence that Koch committed any overt acts of misconduct. Instead, Koch was retained in SMU II based entirely on his status as an AB member, established by a single photograph, two lists, and four associations.[14]

*Hill* admonishes that courts should refrain from re-weighing the evidence when conducting a due process examination, and instead look to see if "there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Hill,* 472 U.S. at 455–56, 105 S.Ct. 2768. An even more important charge, however, is that courts must never lose sight of the nature of the liberty deprivation that is at stake in the first instance. That is the central lesson of *Sandin.* The nature of the deprivation is the paramount consideration in the due process analysis,

critically relevant at both the liberty and process stages of the inquiry. As we held in our prior opinion: "*Sandin* was an attempt to return to basic due process principles which stress proportionality and a balancing of the interests involved. More process is due where the deprivation is greatest." *Koch,* 96 F.Supp.2d at 964–65 (footnote omitted). This is in keeping with *Sandin* and *Hill. See Sandin,* 515 U.S. at 478, 115 S.Ct. 2293 (hearkening a return to the principles of *Wolff* and "its intricate balancing of prison management concerns with prisoners' liberty in determining the amount of process due"); *Hill,* 472 U.S. at 454, 105 S.Ct. 2768 ("The requirements of due process are flexible and depend on a balancing of the interests affected by the relevant government action.").

Indefinite, and likely permanent, detention in SMU II strikes us as one of the most severe deprivations of liberty that can be visited upon an inmate within the ADOC. Defendants do not dispute this point. Given the extreme nature of the deprivation at issue here, the question then becomes: is Koch's status as a member of the Aryan Brotherhood, absent evidence of any overt acts of misconduct, sufficient to justify indefinite detention in SMU II? We think that status absent misconduct is not enough under these circumstances.

Determining the status of an inmate as a gang member is fraught with difficulties. According to one court-appointed monitor: "gang membership ... is inherently virtually impossible to ascertain or discover with precision. The gang's only tangible existence is in the minds of the prisoners and prison officials. It is quite unlikely that any two individuals would

---

**14.** Perhaps aware that the evidence presented at the 1998 hearing was somewhat slim, defendants submitted additional evidence of Koch's AB membership in their response

brief. Defendants' attempt to bolster their proof was unnecessary, however, as we will assume for the purposes of this opinion that Koch's AB status has been established.

independently list the same set of persons as members of the group."

*Madrid,* 889 F.Supp. at 1272 n. 221 (quoting report of the monitor appointed in the *Toussaint* litigation). The director of California's STG program concurs, stating that gang membership is difficult to ascertain with precision absent evidence of "over acts, self-admission, [or] gang related offenses." (Parry Dep. at 21). The extreme act of placing an inmate in SMU II for an indefinite term should not be based on such a precarious endeavor.

This conclusion has support in the literature regarding prison management of gangs. A number of recent studies conclude that incarceration in SMU-like conditions should be based on some evidence of overt misconduct and not on status alone. *See* Scott N. Tachild, *Indeterminate Sentences in Supermax Prisons Based Upon Alleged Gang Affiliations: A Reexamination of Procedural Protection and a Proposal for Greater Procedural Requirements,* 83 Calif.L.Rev. 1115, 1138–46 (1995); *Supermax Prisons: An Overview and General Considerations,* U.S. Department of Justice, National Institute of Corrections, Jan. 1999 (Koch Exh. II.5) (suggesting that segregation should be based "solely on actual behavior" because "[a]ttempting to use predictive criteria based on subjective information has led historically to unsatisfactory and possibly indefensible results"); Phillip Kassel, *The Gang Crackdown in Massachusetts Prisons: Arbitrary and Harsh Treatment Can Only Make Matters Worse,* 24 New Eng. J. on Crim. & Civ. Confinement 37, 59 (1998) (discussing prison studies and arguing that prisons should "punish prisoners' conduct, not their status" in part because "[p]unishing status, particularly since accurate gang' identifications are so difficult, can give rise to the justified perception of arbitrariness in prison management, contributing to instability."); Human Rights Watch, *Supermax Prisons: An Overview,*

at http://www.hrw.org/reports/2000/super-max/Sprmx002.htm (arguing that "[m]ere membership in a gang, absent actual dangerous or predatory behavior, should not be the basis for supermax confinement."); Jerry R. DeMaio, *If You Build It, They Will Come: The Threat of Overclassification In Wisconsin's Supermax Prison,* 2001 Wis.L.Rev. 207, 229 (2001) ("The only fair solution may be to define gang activity based on objective, concrete criteria, such as documented assaultive or threatening behavior. This would lower the risk of misidentifying gang members, and subjecting them to unnecessary intensive incarceration at [Wisconsin's SMU equivalent].").

Focusing on conduct rather than status is a familiar constitutional concept. The Supreme Court has endorsed this principle in a variety of different substantive contexts. For example, when it examined McCarthy-era laws regarding subversive organizations, the Court held that "the bare fact of membership" in the Communist Party was an insufficient basis for punishment; rather, due process required proof of active involvement, specific intent, or illegal conduct prior to deprivation of a protected right. *Aptheker v. Secretary of State,* 378 U.S. 500, 509–14, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964) (holding that a provision of the Subversive Activities Control Act which prohibited a Communist Party member from applying for or using a passport infringed on Fifth Amendment guarantees); *Scales v. United States,* 367 U.S. 203, 221–28, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961) (holding that the Smith Act's membership provision did not violate the Fifth Amendment's Due Process Clause only because it required evidence of active membership and a specific intent to overthrow the government and was not directed at punishing "nominal membership"). Similarly, in *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962),

and *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), the Supreme Court held that it was unconstitutional to punish the status of drug addiction absent any evidence of overt misconduct. *Robinson,* 370 U.S. at 667, 82 S.Ct. 1417 (holding that a California statute criminalizing the status of being a drug addict inflicted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments); *Powell,* 392 U.S. at 552, 88 S.Ct. 2145 (upholding statute because "Texas . . . has not sought to punish a mere status, as California did in *Robinson* . . . [rather] it has imposed . . . a criminal sanction for public behavior . . .").

More recently, the Supreme Court has criticized status-based deprivations as contrary to equal protection principles. *See Romer v. Evans,* 517 U.S. 620, 635, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (striking down Colorado Amendment 2, which prohibited local governments from enacting laws protecting the civil rights of gays and lesbians, in part because "[i]t is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests . . ."). *See also Steffan v. Perry,* 41 F.3d 677, 709–14 (D.C.Cir.1994) (*en banc* ) (Wald, J., dissenting) (arguing that military regulations prohibiting gays and lesbians from serving in the armed forces are unconstitutional because, *inter alia,* they punish status not conduct); *City of Chicago v. Youkhana,* 277 Ill.App.3d 101, 213 Ill.Dec. 777, 660 N.E.2d 34, 41–42 (1 Dist.1995) (holding that a city ordinance prohibiting gang members from loitering was unconstitutional because, *inter alia,*

"it is not the conduct, but the status, that triggers the ordinance."), *aff'd on other grounds sub nom., City of Chicago v. Morales,* 177 Ill.2d 440, 227 Ill.Dec. 130, 687 N.E.2d 53 (1997), *aff'd,* 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). The consistent theme to be drawn from these varied cases is that a liberty deprivation should be based on misconduct, not status, and courts should be wary of regulations that provide otherwise.

The indefinite nature of Koch's confinement in SMU II makes his status-based detention even more alarming. Under DMO 57, a validated STG member was allowed to demonstrate that he was no longer an active member of the gang and thereby become eligible for transfer out of SMU II. Indeed, the ADOC determined that Koch was an inactive AB member in 1997 (Koch Exh. I.10). DO 806 rescinded the active/inactive provision of the regulation as it pertained to validated STG members. According to defendants, the distinction between active and inactive is meaningless because gang membership is a lifetime commitment. Defendants contend that there essentially is no way out of a prison gang. And since debriefing sets the inmate on a path to protective custody in SMU I and not release to the general population, there is no realistic way out of solitary confinement.[15]

We are not unmindful of the danger posed by prison gangs.[16] Defendants' discussion of the violence done by gangs and the "logistical nightmare" gang-related activities pose for prison administrators is well taken. Defendants argue that "responsible administrators must take appro-

---

**15.** Other states, including California, have set up incentive structures by which validated STG members can demonstrate their inactive status and earn release from segregated confinement (Parry Dep. at 16–19).

**16.** Nor are we unaware that a number of decisions out of the Northern District of Cali-

fornia have held that indefinite confinement in Pelican Bay's SHU based on an inmate's status as a validated STG member comports with due process. *See, e.g., Renteria,* 1999 WL 1051948, at *2; *Galvaldon,* 1997 WL 765955, at *7–8; *Madrid,* 889 F.Supp. at 1278.

priate action to neutralize the influence of gangs in prison and to stop their illegal activity" (Df. Br. at 22). We are in complete agreement with this statement. But we do not agree with defendants' conclusion that indefinite segregation in SMU II based on status alone passes constitutional muster. We hold that Koch cannot be detained in SMU II for an indefinite term based solely on his status as an AB member and absent any evidence of overt acts of misconduct. This is not to say that it would be impermissible to assign an inmate to SMU II for a short period based on gang status. Such detention may be a useful tool to discourage gang membership. But indefinite segregation of the order endured by Koch requires more than proof of status alone.

Due process is a flexible concept that balances the need to avoid arbitrary deprivations of liberty against the interests of deferential prison administration. *Hill*, 472 U.S. at 454–55, 105 S.Ct. 2768. Here, Koch has endured five and one-half years in SMU II—an extreme form of liberty deprivation. In order to balance the scale, due process requires more than just proof of status. The ADOC presented no evidence of misconduct on the part of Koch at the 1998 validation hearing. Therefore, his continued detention in SMU II offends the Due Process Clause.

### CONCLUSION

For the reasons set forth above, Koch's motion for injunctive relief is granted. Five and one-half years in SMU II, with no realistic prospect of release from solitary confinement, cannot follow from a process based solely on status and not at all on evidence of overt acts of misconduct. We order that Koch be released from SMU II.